**SEATTLE AUDUBON SOCIETY,**
**et al., Plaintiffs,**

v.

**John L. EVANS, et al., Defendants.**

**and**

**Washington Contract Loggers**
**Association, et al.,**
**Intervenors.**

**No. C89–160 WD.**

United States District Court,
W.D. Washington,
at Seattle.

May 23, 1991.

Thomas A Starrs, Perkins Coie, Corrie Johnson Yackulic, Todd D. True, Victor M Sher, Sierra Club Legal Defense Fund, Seattle, Wash., Gary K. Kahn, Reeves, Kehn & Eder, Portland, Or., for plaintiffs.

Susan L. Barnes, U.S. Atty's. Office, Seattle, Wash., Wells D. Burgess, Allan D Brock, U.S. Dept. of Justice, Environment and Natural Resources Div., General Litigation Section, Washington, D.C., for defendants.

Ann Forest Burns, Seattle, Wash., for amicus curiae.

Mark C. Rutzick, Preston, Thorgrimson, Shidler, Gates & Ellis, Portland, Or., for amicus curiae and intervenors-defendants.

## MEMORANDUM DECISION AND INJUNCTION

DWYER, District Judge.

### I.

### INTRODUCTION

On March 7, 1991, the court entered an order on summary judgment declaring unlawful a proposal of defendants John L. Evans, et al. (collectively the "Forest Service") to log northern spotted owl habitat

in national forests located in Washington, Oregon, and Northern California without complying with requirements of the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.* Order on Motions for Summary Judgment and for Dismissal (Mar. 7, 1991) (Dkt. # 824). On the basis of that order plaintiffs Seattle Audubon Society, et al. (collectively "SAS") have moved for a permanent injunction prohibiting the sale of logging rights in additional spotted owl habitat areas until the Forest Service complies with NFMA and its regulations by adopting standards and guidelines to assure that a viable population of the species is maintained in the forests. The Forest Service proposes a different injunction, one that would permit, in the interim, additional sales in owl habitat if they are consistent with the recommendations of the Report of the Interagency Scientific Committee to Address the Conservation of the Northern Spotted Owl ("ISC Report") issued in April 1990. Intervenors Washington Contract Loggers Association, et al. (collectively "WCLA") support the Forest Service's proposal. The two sides agree that the court should set a date for the Forest Service to adopt a plan to assure the owl's viability.

The court granted WCLA's request for an evidentiary hearing on the scope of injunctive relief, and all parties' request for prehearing discovery. *See Charlton v. Estate of Charlton,* 841 F.2d 988, 989 (9th Cir.1988). An order issued April 1, 1991, specified the subjects for the hearing. Order Setting Evidentiary Hearing re Injunctive Relief (Dkt. # 867). The hearing began on April 30 and ended on May 9, 1991. All parties presented evidence, rested their cases, and gave oral argument through counsel. The evidence admitted, the arguments and briefs, and the proposed findings submitted by counsel have been fully considered.

## II.

## HISTORY OF THIS CASE AND RECENT ADMINISTRATIVE PROCEEDINGS

The national forests are managed by the Forest Service under NFMA. Regulations promulgated under that statute provide that

> [f]ish and wildlife shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area.

36 C.F.R. § 219.19. A viable population is "one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area." *Id.* To insure viability, habitat must be provided to support at least a minimum number of reproductive individuals. *Id.*

Since not every species can be monitored, "indicator species" are observed as signs of general wildlife viability. *Id.* § 219.-19(a)(1). The northern spotted owl is an indicator species.

While having these conservation duties, the Forest Service is also charged with managing these lands to "provide for multiple use and sustained yield of goods and services from the National Forest System in a way that maximizes long term net public benefit in an environmentally sound manner." *Id.* § 219.1(a). *See generally* C. Wilkinson & H. Anderson, *Land and Resource Planning in the National Forests,* 64 Or.L.Rev. 1 (1985).

In recent years logging and development have steadily reduced wildlife habitat in the Pacific Northwest. At the same time many local mills have experienced log shortages. The result is an intensified struggle over the future of the national forests.

In 1989 SAS and WCLA sued the Forest Service in this court, challenging the legality of an administrative decision adopting standards and guidelines for managing northern spotted owl habitat in the national forests. The administrative decision was set out in a Record of Decision ("ROD") issued on December 8, 1988, and an accompanying Final Supplement to the Environmental Impact Statement For an Amendment to the Pacific Northwest Regional Guide ("FSEIS"). For opposite reasons, the two sets of plaintiffs challenged the Forest Service's plan under NFMA and the National Environmental Policy Act

("NEPA"), 42 U.S.C. § 4321 *et seq.*, and their implementing regulations.

The court consolidated the two cases, ordered them expedited, and set a final hearing date for June 13, 1989. On March 24, 1989, the court issued a temporary injunction deferring specified timber sales in Washington and Oregon for what then appeared to be a few weeks until the final hearing. Order on Motions for Preliminary Injunction and for Change of Venue at 2 (Mar. 24, 1989) (Dkt. # 97).

On May 11, 1989, the Forest Service moved for a stay of all proceedings pending completion of a conference process between itself and the Fish and Wildlife Service ("FWS"). In a separate case, Judge Zilly of this district had ruled that the FWS was acting arbitrarily and capriciously, and contrary to law, in failing to list the spotted owl as endangered or threatened under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq. Northern Spotted Owl (Strix Occidentalis Caurina) v. Hodel,* 716 F.Supp. 479 (W.D.Wash.1988). On April 25, 1989, having reconsidered in response to Judge Zilly's order, the FWS announced its intent to list the owl as "threatened" under the ESA. SAS and WCLA agreed that a stay of the present case was warranted so that the two agencies could consult. The Forest Service proposed a temporary ban on timber sales containing forty or more acres of spotted owl habitat. This was adopted by order of May 26, 1989. Order on Motion for Stay (Dkt. # 173).

The Forest Service said it would present within thirty days interim measures to protect spotted owl habitat during the FWS listing process. It did not do so. Instead it moved on August 24, 1989, for leave to go forward with eleven timber sales that had been deferred. At that point there was no spotted owl management plan in effect. The court on its own motion lifted the stay and ordered an expedited final hearing in these cases. Order Lifting Stay, etc. (Sept. 12, 1989) (Dkt. # 226).

Congress in the meantime was debating legislation which would provide a short-term supply of national forest and Bureau of Land Management ("BLM") timber to mills in Washington and Oregon without having the usual type of agency action subject to judicial review. The final result was section 318 of the Department of the Interior and Related Agencies Appropriations Act for Fiscal Year 1990, Pub.L. No. 101–121, § 318, 103 Stat. 701, 745–50 (1989) ("section 318"), which became law on October 23, 1989. The Congressional conference committee presented the bill as necessary "because of the failure of the agencies [i.e., the Forest Service and the BLM] to take steps on their own to resolve these matters in a manner which could have prevented the current situation." H.R.Conf. Rep. No. 264, 101st Cong., 1st Sess., *reprinted in* 135 Cong.Rec. H6411 (daily ed. Oct. 2, 1989).

Section 318 included the following provisions, among others:

— It directed the Forest Service and the BLM to offer specified quantities of timber for sale in fiscal years 1989 and 1990. Subsection (a).

— It contained restrictions on the cutting of "ecologically significant old growth forest stands" except as necessary to meet the sales quota, barred logging in certain "spotted owl habitat areas," and adopted temporarily (with a few modifications) the standards and guidelines proposed in the Forest Service's December 1988 ROD. Subsections (b)(1), (2) and (3).

— It stated that Congress "determines and directs" that management of the forests for fiscal years 1989–90 according to its provisions "is adequate consideration for the purpose of meeting the statutory requirements that are the basis for [the present cases and a similar case pending in the District of Oregon]." Subsection (b)(6)(A).

— It directed the Forest Service to prepare a new spotted owl plan and have it in place by September 30, 1990:

The Forest Service is directed to review and revise as appropriate the decision adopted in the December 1988 Record of Decision referenced in subsection (b)(6)(A) of this section and shall consider any new information gathered

subsequent to the issuance of the Record of Decision, including the interagency guidelines for conservation of northern spotted owls developed by the Interagency Scientific Committee to address conservation of the northern spotted owl. This review, and any resulting changes to the December 1988 decision determined to be necessary by the Forest Service are to be completed and in effect not later than September 30, 1990.

Subsection (b)(6)(B).

On November 6, 1989, this court vacated the preliminary injunction because section 318 had become law as to 1989–90 timber sales. The court construed the statute as a temporary amendment of the environmental laws, and therefore rejected SAS's constitutional challenge to subsection (b)(6)(A). Memorandum Decision Re Constitutionality (Nov. 14, 1989) (Dkt. # 278).

An interlocutory appeal was certified under 28 U.S.C. § 1292(b). The court of appeals declined to stay the application of section 318 pending appeal.

Over the next several months the parties proceeded under section 318. SAS brought a series of challenges to timber sales under the standards of the temporary statute. On May 11, 1990, this court entered an order on the first such challenge, enjoining the Cowboy sale in the Umpqua National Forest. (Dkt. # 389). On appeal by the Forest Service, the court of appeals affirmed in an unpublished opinion filed August 27, 1990. *Seattle Audubon Soc'y v. Robertson,* 912 F.2d 469 (table) (9th Cir. 1990).

Other challenges to 1990 timber sales followed the district court decision on the Cowboy sale. The court enjoined three sales on the basis that the Forest Service had not complied with section 318; the agency withdrew two other sales after a motion for summary judgment was filed; and the court found for the Forest Service as to one sale. (Dkt. ## 459, 608, 677). No party appealed from these rulings.

On September 18, 1990, the court of appeals issued an opinion, and on October 30 an amended opinion, finding the first sentence of section 318(b)(6)(A) unconstitution-

al under the separation of powers doctrine. *Seattle Audubon Soc'y v. Robertson,* 914 F.2d 1311 (9th Cir.1990).

The appeal to the Ninth Circuit concerned the part of section 318 in which Congress "determines and directs" that management of the forests in 1989–90 according to subsections (b)(3) and (b)(5) "is adequate consideration for the purpose of meeting the statutory requirements" underlying the cases in this district and in Oregon. The court of appeals ruled that this provision was not a temporary amendment of the environmental laws but rather an unconstitutional attempt to adjudicate rather than legislate. The requirements of section 318 were thus held to be in addition to, and not in lieu of, those of the general environmental statutes. The decision did not affect the other parts of section 318.

While the above-described events were taking place, federal administrative agencies took further action regarding the spotted owl. The Interagency Scientific Committee was established in 1989 by agreement of the Forest Service, the Bureau of Land Management of the Department of the Interior, the Fish and Wildlife Service, and the National Park Service. Its mission was "to develop a scientifically credible conservation strategy for the northern spotted owl in the United States." Hearing Exhibit ("Exh.") 1 at 1. On April 2, 1990, the ISC issued its report. *See* 55 Fed.Reg. 40412, 40413; Report of the Interagency Scientific Committee to Address the Conservation of the Northern Spotted Owl, *A Conservation Strategy for the Northern Spotted Owl* (U.S.D.A., et al. 1990) (Exh. 1).

In June 1990 the Fish and Wildlife Service, having completed its listing process, listed the owl as a threatened species under the Endangered Species Act. *Determination of Threatened Status for the Northern Spotted Owl,* 55 Fed.Reg. 26114.

The Forest Service did not comply by the deadline of September 30, 1990—or at all—with section 318's requirement that it adopt a revised plan to ensure the owl's viability.

On September 28, 1990, the Department of Agriculture gave notice that the Forest Service was vacating the December 1988 Record of Decision, and that it would manage timber sales in a manner "not inconsistent with" the ISC Report. 55 Fed. Reg. 40413 (1990). This announcement was made without notice, hearing, environmental impact statement, or other rulemaking procedures.

On December 18, 1990, this court enjoined the Forest Service from proceeding with twelve proposed fiscal year 1990 timber sales because the agency had failed to comply with NFMA by having any standards and guidelines for spotted owl viability in place. The order reaffirmed what the court of appeals had already held, i.e., that section 318 did not displace NFMA. Order on Motions Heard December 5, 1990 (Dec. 18, 1990) (Dkt. # 757). Leave was granted to the Forest Service to pursue a newly-raised argument that its duty under NFMA to maintain the species ended when the listing under ESA occurred. *Id.*

On February 26, 1991, Judge Zilly ruled in No. C88–573Z that the FWS had again failed to comply with the law, stating:

> Upon the record presented, this Court finds the [Fish and Wildlife] Service has failed to discharge its obligations under the Endangered Species Act and its own administrative regulations. Specifically, the Service acting on behalf of the Secretary of the Interior, abused its discretion when it determined not to designate critical habitat concurrently with the listing of the northern spotted owl, or to explain any basis for concluding that the critical habitat was not determinable. These actions were arbitrary and capricious, and contrary to law. 5 U.S.C. § 706.

*Northern Spotted Owl (Strix Occidentalis Caurina) v. Lujan,* 758 F.Supp. 621, 629 (W.D.Wash.1991).

The Forest Service's argument in this case that it was relieved of its NFMA duty to plan for the spotted owl's viability once the species was listed by the FWS as "threatened" was rejected in an order entered March 7, 1991. Order on Motions for Summary Judgment and for Dismissal

(Dkt. # 824), 1991 WL 180099. The court found not only that the argument was insupportable, but that "the Forest Service has understood at all times that its duties under NFMA and ESA are concurrent." *Id.* at 15. Accordingly, summary judgment was granted determining that the Forest Service's proposal to log spotted owl habitat without complying with NFMA was unlawful.

WCLA's complaint was dismissed as moot, without opposition, because the 1988 ROD which it challenged had been withdrawn. *Id.* at 25. WCLA was then allowed to intervene in the SAS action, and thus remains a party. Order Granting Motion for Leave to Intervene (Apr. 1, 1991) (Dkt. # 868).

### III.

### AMICUS CURIAE BRIEF OF SISKIYOU COUNTY

On May 16, 1991, a week after the evidentiary hearing ended, the Board of Supervisors and Office of Education of Siskiyou County, California ("Siskiyou County"), sought leave to file a brief *amicus curiae.* Leave was granted, the brief has been filed, and SAS has responded.

Siskiyou County's brief is untimely but has nevertheless been fully considered on the merits. It argues that SAS has no standing to seek relief relating to national forests in Northern California, as distinguished from those in Washington and Oregon; and that, if SAS does have standing, any injunctive relief (even in the form proposed by the Forest Service) should exclude Northern California.

The Forest Service's *Federal Register* notice that the court found to be an unlawful proposal to log owl habitat without compliance with NFMA applied to four national forests in Northern California (in Forest Service Region 5) as well as to thirteen in Oregon and Washington (in Region 6). 55 Fed.Reg. 40412, 40414 (1990). SAS's amended complaint alleges the illegality of the proposed timber sales in the forests of Northern California as well as in those of Washington and Oregon. Second

Amended Complaint at ¶¶ 8, 18, 23, and First Claim for Relief at ¶ 1 (Dkt. # 731). The order granting summary judgment ruled that the "agency's failure to date to comply, or begin compliance, with NFMA requirements is arbitrary and capricious, and not in accordance with law." Order of March 7, 1991 at 26 (Dkt. # 824). The proposal to log owl habitat in the four Northern California forests without NFMA compliance was not excepted from the ruling.

As to standing, SAS has challenged an agency action that affects a bird threatened throughout its range. The issue is not limited to specific metes and bounds. As the ISC has noted: "Spotted owls, after all, are oblivious to our political and institutional boundaries." Exh. 1 at 41. SAS's standing as a party "adversely affected or aggrieved" has already been established. See Order of March 7, 1991 at 8 (Dkt. # 824); Declaration of Bonnie Phillips–Howard (Jan. 14, 1991) (Dkt. # 783); *Lujan v. National Wildlife Fed'n*, —— U.S. ——, 110 S.Ct. 3177, 3185–86, 111 L.Ed.2d 695 (1990). SAS's motion for leave to file additional declarations showing standing is not necessary, but is granted in order to complete the record.

As to the geographic scope of the injunction, Siskiyou County's argument is that the spotted owl's viability will not be harmed by habitat destruction in Northern California because habitat develops faster there—on the order of fifty or eighty years rather than perhaps a hundred and fifty years farther north. However, the FWS has listed the owl as threatened in Northern California as well as elsewhere. 55 Fed.Reg. 26114. The ISC has identified "areas of special concern" in Northern California, and, even under its recommended plan, estimates only a "low" or "moderate" prospect of viability in three of the area's four "physiographic provinces" in fifty years. Exh. 1 at 68, 386.

Nothing has been presented that would justify excluding the four Northern California forests, either on biological or economic grounds, from injunctive relief, regardless of whether SAS's or the Forest Service's proposed order is adopted.

## IV.

## STANDARDS GOVERNING INJUNCTIVE RELIEF

The standards governing whether and to what extent a permanent injunction should issue are summarized in *Friends of the Earth v. Hall*, 693 F.Supp. 904, 948 (W.D.Wash.1988):

In determining whether to issue an injunction where statutory violations have occurred, the court must engage in a two part analysis. *See Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 107 S.Ct. 1396, 1402–04, 94 L.Ed.2d 542 (1987); *Save the Yaak Committee v. Block*, 840 F.2d 714, 722 (9th Cir.1988). First, the court must determine whether the statute restricts the court's equity jurisdiction, that is whether the statute would either require or preclude issuance of an injunction to remedy a violation. *Village of Gambell*, 107 S.Ct. at 1403; *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 313, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). If the court finds that no such limitation can be found either in the statutory language itself or as a necessary and inescapable inference of the statutory text, then the court must engage in traditional equity balancing to determine the appropriateness of an injunction. *Village of Gambell*, 107 S.Ct. at 1402; *Save the Yaak*, 840 F.2d at 722.

■ Nothing in NFMA alters the court's equity jurisdiction. The traditional "basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero–Barcelo, supra*, 456 U.S. at 312, 102 S.Ct. at 1803.

In *Village of Gambell, supra*, 480 U.S. at 545, 107 S.Ct. at 1404, the Court stated:

Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, there-

fore, the balance of harms will usually favor the issuance of an injunction to protect the environment.

■ However, the party seeking relief must show not merely a statutory violation, but a probability of injury serious enough to outweigh any adverse effects from the issuance of an injunction. *Id.*

## V.

## FINDINGS OF FACT

The evidentiary hearing held from April 30 to May 9, 1991, provided a wealth of information. Expert testimony of high quality from biologists, economists, and others was presented by both sides. From the evidence admitted at the hearing the court makes and enters the following findings of fact:

### A. *Background Findings*

1. The fate of the spotted owl has become a battleground largely because the species is a symbol of the remaining old growth forest. As stated in the ISC Report:

Why all the fuss about the status and welfare of this particular bird? The numbers, distribution, and welfare of spotted owls are widely believed to be inextricably tied to mature and old-growth forests. Such forests have been significantly reduced since 1850 (mostly since 1950) by clearing for agriculture, urban development, natural events such as fire and windstorms, and most significantly, by logging in recent decades. Nearly all old growth has been removed on private lands. Most of the remainder is under the management of the BLM, FS, and NPS on Federal lands. As its habitat has declined, the owl has virtually disappeared from some areas and its numbers are decreasing in others.

Exh. 1 at 7.

2. An old growth forest consists not just of ancient standing trees, but of fallen trees, snags, massive decaying vegetation, and numerous resident plant and animal species, many of which live nowhere else.

3. A great conifer forest originally covered the western parts of Washington, Oregon, and Northern California, from the Cascade and Coast mountains to the sea. Perhaps ten percent of it remains. The spaces protected as parks or wilderness areas are not enough for the survival of the northern spotted owl.

4. The old growth forest sustains a biological community far richer than those of managed forests or tree farms. As testified by Dr. William Ferrell, a forest ecologist:

The most significant implication from our new knowledge regarding old-growth forest ecology is that logging these forests destroys not just trees, but a complex, distinctive, and unique ecosystem.

Exh. 12 at 6.

5. The remaining old growth stands are valued also for their effects on climate, air, and migratory fish runs, and for their beauty. A 1984 Forest Service document summed up the controversy:

There are at least three main reasons cited for maintaining old growth: wildlife and plant habitat, ecosystem diversity, and preservation of aesthetic qualities. Those opposed to the retention of old growth are primarily concerned with economic factors and urge rapid conversion of the existing old growth to managed forests of productive, young age classes.

Pacific N.W. Region, United States Forest Service, United States Dep't of Agric., *Regional Guide for the Pacific Northwest Region* at p. 3–40 (May 1984), attached as Exh. F to Second Declaration of Corrie Yackulic (July 26, 1990) (Dkt. # 445).

6. Through most of the country's history there was little or no logging in the national forests. Intensive logging began with World War II and has accelerated.

7. NFMA was adopted in 1976, after three decades of heavy logging, in the hope of serving both wilderness and industry values. Senator Humphrey of Minnesota, a sponsor of the act, stated:

The days have ended when the forest may be viewed only as trees and trees viewed only as timber. The soil and the

water, the grasses and the shrubs, the fish and the wildlife, and the beauty that is the forest must become integral parts of resource managers' thinking and actions.

122 Cong.Rec. 5619 (daily ed. Mar. 5, 1976).

8. Despite increasing concern over the environment, logging sales by the Forest Service have continued on a large scale. Timber harvests in the national forests in Washington and Oregon ranged from 4.448 billion to 5.082 billion board feet per year in 1985 through 1989, amounting to between 30% and 33% of the total harvested in those states in those years.

9. Some major firms in the Pacific Northwest have extensive private forests and need little or no wood from public sources. Many small mills and logging companies depend in whole or in part on federal timber.

10. Mill owners and loggers, and their employees, especially in small towns, have developed since World War II an expectation that federal timber will be available indefinitely, and a way of life that cannot be duplicated elsewhere.

11. The region's timber industry has been going through fundamental changes. The most important is modernization which increases productivity and reduces the demand for labor (i.e., the jobs available). There have also been recent changes in product demand, in competition from other parts of the country and the world, and in the export of raw logs for processing in the Far East. The painful results for many workers, and their families and communities, will continue regardless of whether owl habitat in the national forests is protected.

B. *Statutory Violations*

12. The records of this case and of No. C88–573Z show a remarkable series of violations of the environmental laws. The Forest Service defended its December 1988 ROD persistently for nearly two years. Congress was persuaded in 1989 to adopt most of the ROD standards as a temporary measure in section 318. But in the fall of 1990 the Forest Service admitted that the ROD was inadequate after all—that it would fail to preserve the northern spotted owl. In seeking a stay of proceedings in this court in 1989 the Forest Service announced its intent to adopt temporary guidelines within thirty days. It did not do that within thirty days, or ever. When directed by Congress to have a revised ROD in place by September 30, 1990, the Forest Service did not even attempt to comply. The FWS, in the meantime, acted contrary to law in refusing to list the spotted owl as endangered or threatened. After it finally listed the species as "threatened" following Judge Zilly's order, the FWS again violated the ESA by failing to designate critical habitat as required. Another order had to be issued setting a deadline for the FWS to comply with the law.

13. The reasons for this pattern of behavior were made clear at the evidentiary hearing.

Dr. Eric Forsman, a research wildlife biologist with the Forest Service, testified, in regard to the 1988 ROD and other Forest Service plans for the spotted owl that preceded the ISC Report:

Q. Were you satisfied at the time with the results of those previous works?

A. No. On all of those plans, I had considerable reservations for a variety of reasons. But primarily because in every instance, there was a considerable—I would emphasize considerable—amount of political pressure to create a plan which was an absolute minimum. That is, which had a very low probability of success and which had a minimum impact on timber harvest.

Hearing Transcript ("Tr.") at 801–02.

George M. Leonard, associate chief of the Forest Service, testified that the agency experts began in early 1990 the work needed to have a revised plan in place by September 30 of that year, as Congress mandated in section 318. But the Secretaries of Agriculture and Interior decided to drop the effort. The public was not told of this decision to ignore what the law required. Mr. Leonard testified:

THE COURT: When was it in 1990 that you ceased your effort to meet that September 30 deadline of Section 318?

A. When the Secretary of Agriculture and Secretary of Interior began discussion, they appointed an interagency team to look at options to the Interagency Scientific Committee report and whatnot. So, it was—in effect, it was escalated above the Forest Service to the secretarial level.

THE COURT: And when in 1990 did that happen?

A. I think it was about in May, but I don't know precisely the date.

THE COURT: Was any public announcement made at any time before October 1990 to the effect that the Forest Service was not going to publish a revised ROD by the end of September?

A. No, there was not.

THE COURT: Was there any reason that you know of that that wasn't announced?

A. It was the—the Secretary-level committee was working throughout the summer looking at options. And the thought was that they would develop an option and that would be the basis for the announcement.

THE COURT: But they never did?

A. They never did, no.

Tr. at 383–84.

The Forest Service had been expressly directed by Congress in section 318 to consider the ISC recommendations in arriving at the ROD to be issued by September 30, 1990. Dr. Jack Ward Thomas, team leader of the ISC, testified to what happened after his committee's report was issued:

Q. After your report was finalized, was it subject to any additional review?

A. Yes, it was.

Q. What occasioned that subsequent review?

A. After the initial release of the report, there was a political decision made by the administration to appoint a cabinet-level review team that would examine the report, a task force that would examine the report, with the idea of seeing if there was some alternative course of action that would be less dramatic economically and socially.

Tr. at 985–86.

14. Had the Forest Service done what Congress directed it to do—adopt a lawful plan by last fall—this case would have ended some time ago.

15. More is involved here than a simple failure by an agency to comply with its governing statute. The most recent violation of NFMA exemplifies a deliberate and systematic refusal by the Forest Service and the FWS to comply with the laws protecting wildlife. This is not the doing of the scientists, foresters, rangers, and others at the working levels of these agencies. It reflects decisions made by higher authorities in the executive branch of government.

C. *Time Needed for Forest Service to Comply with NFMA*

16. The Forest Service seeks an allowance of fifteen more months, or until July 31, 1992, to prepare a new ROD and environmental impact statement. Another month would have to pass before the ROD could take effect. The agency thus proposes to accomplish by August 31, 1992, the step that Congress directed it to complete by September 30, 1990. The sixteen months, according to the testimony of Mr. Leonard, "would include several months for analyzing comments and preparing the final document." Tr. at 368. But the agency declines to make a firm prediction about even this extended timetable. Mr. Leonard testified that two or three years might go by before his agency reached a decision, depending on future developments such as FWS's promulgation of a species recovery plan. *See* Tr. at 370–71, 374.

17. Further delays of this magnitude are neither necessary nor tolerable.

18. In adopting section 318, which became law on October 23, 1989, Congress directed the Forest Service to have a revised spotted owl plan in effect eleven months later. Subsection (b)(6)(B). In doing so Congress made clear that it expected

full compliance. Representative AuCoin, a supporter of the legislation, stated:

I want to put the Forest Service on notice right now, Madam Speaker, that we expect the Forest Service to complete, to adopt, and to implement new forest plans in the coming year. Thirteen years have passed since the enactment of the National Forest Management Act; 4 years have passed since the deadline for completion of initial forest plans. We should not have to be here on the floor today to cover this agency's mistakes, but yet we are here.

135 Cong.Rec. H6506 (daily ed. Oct. 3, 1989).

19. According to Mr. Leonard's testimony, the Forest Service began work in early 1990 to meet the congressional deadline. It had been directed in section 318 to consider the forthcoming ISC Report. The report came out in April. Work was then stopped by a decision made at the cabinet level. Tr. at 381–84.

20. The Forest Service now has advantages it lacked in early 1990. Much of the research and analysis has been done. The ISC Report, a thorough treatment, has been in existence for more than a year. The agency also has the benefit of an opinion letter from the FWS dated April 10, 1991, commenting at length on the ISC strategy and giving recommendations. Exh. A–7.

21. With the knowledge at hand, there is no reason for the Forest Service to fail to develop quickly a plan to ensure the viability of the spotted owl in the national forests. Coordination with the FWS need not be an obstacle; the agencies have coordinated their efforts on other species, and can on this one. The job could be completed in less time than was allowed by Congress in 1989 when it adopted section 318. However, equal time of eleven months will be afforded. The time will run from April 1, 1991, when the court ordered the agency to proceed diligently in compliance with NFMA. (Dkt. # 867). A new ROD with accompanying EIS will thus be due on February 3, 1992, to take effect on March 5, 1992. The net result is that the agency has a seventeen-month extension to complete the job that Congress mandated be done by September 30, 1990.

### D. *Probability of Irreparable Harm*

22. The northern spotted owl is now threatened with extinction. The ISC Report states:

We have concluded that the owl is imperiled over significant portions of its range because of continuing losses of habitat from logging and natural disturbances. Current management strategies are inadequate to ensure its viability. Moreover, in some portions of the owl's range, few options for managing habitat remain open, and available alternatives are steadily declining throughout the bird's range. For these reasons, delay in implementing a conservation strategy cannot be justified on the basis of inadequate knowledge.

Exh. 1 at 1.

The FWS has found that the owl is threatened *throughout* its range. 55 Fed. Reg. 26114.

23. The population of northern spotted owls continues to decline. "We're going to have to arrest that decline and reverse it," as Dr. Thomas testified. Tr. at 1007.

24. "Spotted owl habitat," also called "suitable habitat," is defined as follows by FWS:

Suitable owl habitat has moderate to high canopy closure (60 to 80 percent); a multi-layered, multi-species canopy dominated by large (> 30 inches in diameter at breast height (dbh)) overstory trees; a high incidence of large trees with various deformities (e.g., large cavities, broken tops, dwarf-mistletoe infections, and other evidence of decadence); numerous large snags; large accumulations of fallen trees and other woody debris on the ground; and sufficient open space below the canopy for owls to fly.

55 Fed.Reg. 26114, 26116 (1990).

The same definition is used in the ISC Report (Exh. 1 at 164), and is adopted for purposes of this order.

25. The Forest Service estimates that an additional 66,000 acres of spotted owl habitat would be destroyed if logging went forward to the extent permitted by the ISC Report over the next sixteen months. That would be in addition to about 400,000 acres of habitat logged in the seven years since the agency began preparing these guidelines, all without having a lawful plan or EIS for the owl's management in place.

26. The ISC Report recommends standards and guidelines aimed at assuring the owl's long-term viability. The strategy contains seven major components: four categories of habitat conservation areas ("HCAs"), two different spacing requirements between HCAs, and the 50:11:40 rule. Exh. 1 at 28–29, 283–343 (Appendices O, P & Q).

27. No timber management activities may take place in HCAs. Category 1 HCAs are designed to hold twenty or more pairs of spotted owls. Exh. 1 at 28, 315 (Appendix Q). Category 2 HCAs are designed to hold between two and nineteen pairs. *Id.* Category 3 HCAs are placed around single pairs of owls in areas of special concern identified by the ISC. *Id.* at 332 (Appendix Q). Category 4 HCAs are designed for the retention of eighty acres of suitable habitat around core areas to provide for connectivity in the forest matrix and future nest sites. *Id.* at 29, 315.

28. Category 1 HCAs can be no more than twelve miles, Category 2 HCAs no more than seven miles, from the nearest neighbor. Exh. 1 at 26 and 320.

29. The ISC's standards and guidelines also specify the type of habitat to be found in the intervening landscape, via the 50:11:40 rule. That rule requires that at least fifty percent of the forested landscape outside HCAs be maintained in stands of timber with an average diameter at breast height of eleven inches or greater, and at least 40% canopy closure. Exh. 1 at 29, 309–10.

30. The ISC's strategy is map-based. Exh. 1 at 29. Using the standards and guidelines outlined above, the ISC has delineated the HCAs on the ground. *Id.* Maps showing the delineation of Category 1 and 2 HCAs accompany the report. Exh. 1, Maps.

31. The ISC Report has been described by experts on both sides as the first scientifically respectable proposal regarding spotted owl conservation to come out of the executive branch. However:

(a) To have a chance of success, the strategy would have to be adopted and followed by the agencies concerned. So far it has not been adopted by any agency. The BLM, which manages extensive old growth forests, has declined to implement the strategy in full. This causes concern even to the experts relied upon by the Forest Service. *See, e.g.,* the testimony of Dr. Mark Boyce at Tr. 968–69. Even temporarily, while a conservation plan is being adopted, the BLM will not comply in full with the 50:11:40 rule. On this score FWS has stated in its April 11, 1991, opinion letter:

> While the Forest Service has agreed to implement both of the major components of the ISC Conservation Strategy, (i.e., establishment and protection of habitat conservation areas and management of areas outside HCAs by the 50–11–40 rule (Thomas et al. 1990a)), the Bureau of Land Management (Bureau) has not made a similar commitment. Specifically, the Bureau has not agreed to fully manage the forest matrix to comply with the 50–11–40 rule. The Bureau's failure to fully implement the strategy may have significant consequences for the spotted owl because of the strategic location of Bureau lands between provinces and within areas of concern, and because much of their land lies within checkerboard ownership. The expected success of the ISC Conservation Strategy was based on full implementation of the recommendations on all Federal lands, beginning with the FY 1991 timber sale program.

Exh. A–7 at 14.

There is nothing in the record to refute these concerns over the BLM's position. The testimony of Joseph Lint, a BLM wildlife biologist, relied upon by the Forest

Service and WCLA, does not contain any opinion on the subject.

(b) The ISC proposal has not been put to the test of public comment and hearings.

(c) The ISC strategy may or may not prove to be adequate. While it is endorsed by well-qualified scientists, it is criticized by others, equally well-qualified, as over-optimistic and risky. The Fish and Wildlife Service has stated that it "may not represent a permanent, long-term solution for conservation or recovery of the spotted owl, nor assure compliance with the [ESA] and National Forest Management Act." Exh. A–7 at 15.

(d) The ISC Report calls for diligent monitoring to sample the results once the program begins:

> A comprehensive monitoring scheme that covers all land ownerships should be developed.... [W]e believe that developing and instituting a fully coordinated program of management, monitoring, research, and development, which operates across all of the landscape that makes up owl habitat, is both essential and overdue.

Exh. 1 at 41.

No monitoring scheme exists, although members of the ISC expected one to be in place by now.

32. To log tens of thousands of additional acres of spotted owl habitat before a plan is adopted would foreclose options that might later prove to have been necessary. The FWS has stated:

> We share the ISC's concern that few options remain open for managing spotted owl habitat and that available management alternatives are steadily declining throughout the range (Thomas et al. 1990a). Adoption of the conservation strategy on an interim basis further reduces alternative conservation options by concentrating timber harvest in spotted owl habitat outside the HCAs, fragmenting remaining contiguous blocks of habitat which lay outside HCAs, and impacting the productivity of spotted owl pairs in the forest matrix by further reducing the amount of suitable habitat within their home ranges. Until a permanent recovery plan is developed and implemented, future management options should be preserved by providing protection for spotted owl pairs and resident singles both in and out of HCAs, and by reserving the remaining contiguous blocks of spotted owl habitat.

Exh. A–7, p. 14.

33. Mr. Leonard of the Forest Service has testified that the agency will consider the alternative of preserving the remaining spotted owl habitat in the national forests. Tr. at 385–86. That alternative would be lost if extensive logging of habitat were to go forward now.

34. A review of proposed sales by the FWS would not be a substitute for compliance with NFMA. The Forest Service is required by law to manage the lands entrusted to it so as to maintain viable populations of native vertebrate species, regardless of whether they are listed by another agency. *See* Order on Motions for Summary Judgment and for Dismissal at 15–20 (Mar. 7, 1991) (Dkt. # 824). An FWS designation of "critical habitat" does not imply that logging will be excluded; the designation "does not prescribe any particular management regime in the areas so designated," and permitted activities may "include timber harvests." *See* 56 Fed.Reg. 20816, 20817–18, 20820 (1991). FWS still has no spotted owl recovery plan. Its recommendation of "prudent measures" to the Forest Service may simplify the work, but does not relieve the latter agency of its stewardship of the national forests.

35. The logging of 66,000 acres of owl habitat, in the absence of a conservation plan, would itself constitute a form of irreparable harm. Old growth forests are lost for generations. No amount of money can replace the environmental loss.

36. While the agency's proposal would involve logging an estimated one percent of the remaining habitat, the experts agree that cumulative loss of habitat is what has put the owl in danger of extinction. There is a substantial risk that logging another 66,000 acres, before a plan is adopted, would push the species past a population

threshold from which it could not recover. Dr. Gordon Orians, an expert in avian populations and ecology, has testified:

Q. Can you summarize why you recommend that there be no further logging while the agency determines its new management plan?

A. I recommend a cessation of logging of owl habitat in the short run because I think the risk that the population crosses a very significant viability threshold is increased significantly by continued loss of its habitat. This will reduce the options to maintain viability in the future.

\* \* \* \* \* \*

Q. What does "significant probability" mean here?

A. "Significant probability" means, in this context, that given the threats that exist on the owl now, by implementing the plan in a manner that continues to lose significant amounts of habitat during a transition period poses very significant risks to the spotted owl population; that is, a reasonably high probability that it would cross such a threshold line.

Tr. at 85, 141.

The Forest Service may decide that Dr. Orians is mistaken, but it has not done so yet.

E. *Economic and Social Consequences*

37. The testimony on economic impact assumed a sixteen-month injunction. The Forest Service would sell between 1.734 and 1.423 billion board feet of timber in fiscal year 1991 (which ends September 30, 1991) from the seventeen "spotted owl" national forests, if permitted to sell timber consistent with the ISC Report. On the same basis it would sell in fiscal year 1992 between 1.9 and 1.453 billion board feet. The sale levels if owl habitat were protected in the interim would be about .394 billion board feet in 1991 and .415 billion in 1992. The difference between protecting and not protecting habitat until the Forest Service develops its plan would thus be between 1.03 and 1.34 billion board feet during fiscal year 1991 and between 1.04 and 1.59 billion board feet during fiscal year 1992.

38. The injunction would not prohibit the logging of existing sales, but rather the sale of additional logging rights in owl habitat areas while the Forest Service was in the process of adopting a plan. Thus, timber sale reductions do not translate directly into harvest reductions.

39. The estimate used by all parties is that as of February 28, 1991, there were 4.778 billion board feet of uncut timber under contract in the "spotted owl" forests. That figure includes four 1990 sales, aggregating 14.1 million board feet, which are subject to a revived legal challenge as the result of a recent court of appeals decision holding that section 318's fifteen-day statute of limitations was equitably tolled. *Seattle Audubon Soc'y v. Robertson*, 931 F.2d 590 (9th Cir.1991). SAS and the other environmental organizations represented by its counsel have waived in open court any challenge to the remaining 1990 sales (except for two which are not yet awarded). Tr. at 24. Subtracting the 14.1 million leaves about 4.764 billion board feet under contract and free of legal challenge. When added to the amount of timber the Forest Service would sell while protecting owl habitat, that supply of timber would last about nineteen months if logging proceeded at the rate experienced during fiscal year 1990. The most credible current forecasts suggest that demand for wood products during 1991 and 1992 will be at or below that of 1990.

40. Any after-effects of an injunction would be reduced by the fact that its period would be six months shorter than that requested by the agency and assumed by the economists who testified.

41. Additional timber supplies from private lands can reasonably be expected to enter the market if the price of timber stumpage increases, as it probably will do if Forest Service sales decline. In addition, some timber now exported will probably be diverted to the domestic market.

42. To the extent that Pacific Northwest mills have had supply shortages, the problem has been exacerbated by the export of raw logs. About thirty percent of

the timber harvested in Washington and eleven percent of that harvested in Oregon is exported. Exports from private lands in Washington, Oregon, and Northern California during 1989 totalled 3.637 billion board feet. The exported logs produce no mill jobs or added value in the United States. A ban on exports would not automatically shift every raw log to domestic buyers, but would provide a major source of additional supply. It is true, as the Forest Service and WCLA point out, that transportation costs from Western Washington to Southern Oregon exceed those for logs produced in the immediate vicinity. They are nevertheless lower than the costs of transportation to Japan, China, or Korea. An export ban would also have the effect of moderating log prices generally.

43. While some mills may experience log shortages during the period of an injunction, that would occur to some degree regardless of whether owl habitat is protected, and there is no way of assuring that the mills most in need of logs would get them if the Forest Service proposal were adopted. National forest timber sales must be awarded on competitive bids. 36 C.F.R. 223.100.

44. Over the past decade many timber jobs have been lost and mills closed in the Pacific Northwest. The main reasons have been modernization of physical plants, changes in product demand, and competition from elsewhere. Supply shortages have also played a part. Those least able to adapt and modernize, and those who have not gained alternative supplies, have been hardest hit by the changes. By and large, the companies with major capital resources and private timber supplies have done well; many of the smaller firms have had trouble.

45. Job losses in the wood products industry will continue regardless of whether the northern spotted owl is protected. A credible estimate is that over the next twenty years more than 30,000 jobs will be lost to worker-productivity increases alone.

46. A social cost is paid whenever an economic transformation of this nature takes place, all the more so when a largely rural industry loses sizeable numbers of jobs. Today, however, in contrast to earlier recession periods, states offer programs for dislocated workers that ease and facilitate the necessary adjustments.

47. Counties in timber-dependent communities derive revenues from the harvest of national forest timber. Federal law presently guarantees counties at least 90% of the average of receipts obtained between 1988 and 1990, unless timber harvests during fiscal 1991 fall by 78%, which no evidence suggests would occur. Revenues from this source will decline later if harvests decline. These public entities, however, do not expect to obtain revenues from sales made in violation of law.

48. The timber industry no longer drives the Pacific Northwest's economy. In Oregon, for example, the level of employment in lumber and wood products declined by seventeen percent between 1979 and 1989. In the same period, Oregon's total employment increased by twenty-three percent.

49. The wood products industry now employs about four percent of all workers in Western Oregon, two percent in Western Washington, and six percent in Northern California. Even if some jobs in wood products were affected by protecting owl habitat in the short term, any effect on the regional economy probably would be small.

50. The remaining wilderness contributes to the desirability of this region as a site for new industries and their employees. The resulting economic gains, while hard to measure, are genuine and substantial. The FWS has recently noted that preservation of old growth brings economic benefits and amenities "of extremely high value." 56 Fed.Reg. 20816, 20822 (May 6, 1991). Exh. A–63.

### VI.

### THE PUBLIC INTEREST AND THE BALANCE OF EQUITIES

■ The court must weigh and consider the public interest in deciding whether to issue an injunction in an environmental case. *See, e.g., Sierra Club v. Penfold,*

857 F.2d 1307, 1318 (9th Cir.1988); *Northern Alaska Environmental Center v. Hodel*, 803 F.2d 466, 471 (9th Cir.1986). It must also consider the balance of equities among the parties. *Village of Gambell*, 480 U.S. at 545, 107 S.Ct. at 1404.

■ The problem here has not been any shortcoming in the laws, but simply a refusal of administrative agencies to comply with them. *See* Findings 12 through 15, above. This invokes a public interest of the highest order: the interest in having government officials act in accordance with law. *See Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

The public also "has a manifest interest in the preservation of old growth trees." *Pilchuck Audubon Soc'y v. MacWilliams*, 19 ELR 20526, 20529 (W.D.Wash.1988).

This is not the usual situation in which the court reviews an administrative decision and, in doing so, gives deference to agency expertise. *See Northwest Coalition for Alternatives to Pesticides v. Lyng*, 844 F.2d 588, 590–91 (9th Cir.1988). The Forest Service here has not taken the necessary steps to make a decision in the first place—yet it seeks to take action with major environmental impact.

■ The loss of an additional 66,000 acres of spotted owl habitat, without a conservation plan being in place, and with no agency having committed itself to the ISC strategy, would constitute irreparable harm, and would risk pushing the species beyond a threshold from which it could not recover.

Any reduction in federal timber sales will have adverse effects on some timber industry firms and their employees, and a suspension of owl habitat sales in the national forests is no exception. But while the loss of old growth is permanent, the economic effects of an injunction are temporary and can be minimized in many ways. *See* Findings 37 through 50, above.

To bypass the environmental laws, either briefly or permanently, would not fend off the changes transforming the timber industry. The argument that the mightiest economy on earth cannot afford to preserve old growth forests for a short time, while it reaches an overdue decision on how to manage them, is not convincing today. It would be even less so a year or a century from now.

For the reasons stated, the public interest and the balance of equities require the issuance of an injunction directing the Forest Service to comply with the requirements of NFMA by March 5, 1992, and preventing it from selling additional logging rights in spotted owl habitat until it complies with the law.

## VII.

## INJUNCTION

On the basis of the foregoing findings and conclusions, it is ordered and adjudged that:

A. The Forest Service is enjoined to proceed diligently in compliance with NFMA, as required by the order entered on April 1, 1991 (Dkt. # 867), and to submit to the court and have in effect by March 5, 1992, revised standards and guidelines to ensure the northern spotted owl's viability, together with an environmental impact statement, as required by NFMA and its implementing regulations. The agency is directed to submit to the court by June 15, 1991, a timetable for completion of the steps to meet this schedule.

B. The Forest Service is further enjoined from auctioning or awarding any additional timber sales from Forest Service Regions Five and Six that would log suitable habitat for the northern spotted owl, as defined above, until the said standards and guidelines are adopted and in effect.