**PORTLAND AUDUBON SOCIETY,** Headwaters, Lane County Audubon Society, Oregon Natural Resources Council, The Wilderness Society, Sierra Club, Inc., Siskiyou Audubon Society, Central Oregon Audubon Society, Kalmiopsis Audubon Society, Umpqua Valley Audubon Society, Natural Resources Defense Council, Plaintiffs,

v.

**Manuel LUJAN, Jr.,** in his official capacity as Secretary, United States Department of Interior, Defendant,

and

Northwest Forest Resource Council, Huffman & Wright Logging Co., Freres Lumber Co., Inc., Lone Rock Timber Co., Inc., Scott Timber Co., Clear Lumber Manufacturing Corp., Yoncalla Timber Products, Inc., Cornett Lumber Company, Inc., Association of O & C Counties and Benton County, Douglas County Forest Products Company, Medford Corporation, Rogge Forest Products, Inc., Defendants–Intervenors.

Civ. No. 87–1160–FR.

United States District Court,
D. Oregon.

Feb. 19, 1992.

See also 952 F.2d 297.

Victor M. Sher, Todd D. True, Sierra Club Legal Defense Fund, Inc., Seattle, Wash., for plaintiffs Portland Audubon Soc., Headwaters, The Wilderness Soc., Sierra Club, Inc., Siskiyou Audubon Soc., Central Oregon Audubon Soc., Kalmiopsis Audubon Soc., Salem Audubon Soc., Umpqua Valley Audubon Soc. and Natural Resources Defense Council.

Michael D. Axline, John E. Bonine, Western Environmental Law Clinic, University of Oregon School of Law, Eugene, Or., for plaintiffs Lane County Audubon Soc. and Oregon Natural Resources Council.

Charles H. Turner, U.S. Atty., Lance A. Caldwell, Asst. U.S. Atty., Roger W. Nesbit, Sp. Asst. U.S. Atty., Portland, Or., for defendant.

Mark C. Rutzick, Preston Thorgrimson Shidler Gates & Ellis, Portland, Or., for defendants-intervenors Northwest Forest Resource Council, Huffman & Wright Logging Co., et al., and Douglas County Forest Products, et al.

Phillip D. Chadsey, Kevin Q. Davis, Stoel Rives Boley Jones & Grey, Portland, Or., for defendant-intervenor Ass'n of O & C Counties and Benton County.

## OPINION

FRYE, District Judge:

The matter before the court is the motion of plaintiffs for a renewed preliminary injunction (# 682).

## BACKGROUND

On October 19, 1987, the plaintiffs, Portland Audubon Society, Headwaters, The Wilderness Society, Sierra Club, Inc., Siskiyou Audubon Society, Central Oregon Audubon Society, Kalmiopsis Audubon Society, Salem Audubon Society, Umpqua Valley Audubon Society, and Natural Resources Defense Council filed this action alleging violations by the defendant, Manuel Lujan, in his official capacity as Secretary of the United States Department of Interior, of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.;* the Oregon & California Lands Act, 43 U.S.C. § 1181a *et seq.;* the Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.;* the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 *et seq.;* and the Administrative Procedures Act (APA), 5 U.S.C. § 553 *et seq.*

In their first claim for relief, the plaintiffs alleged that the decision of the Director of the Bureau of Land Management (BLM) for the State of Oregon on April 10, 1987 not to prepare a Supplemental Environmental Impact Statement prior to the completion of a new Environmental Impact Statement which was expected at that time to be completed by the fall of 1990 violated the requirements of NEPA.

On May 18, 1989, this court filed an opinion, in which it concluded:

The Environmental Impact Statements prepared between 1979 and 1983 do not address the issues of adequate population size or the effects of habitat fragmentation upon the long-range survival of the spotted owl species. Neither does the Spotted Owl Environmental Assessment prepared in 1987. This is a significant omission from the Spotted Owl Environmental Assessment in light of the new information available at the time it was prepared.

Since the Spotted Owl Environmental Assessment does not address the critical issues of adequate population size and the effects of habitat fragmentation upon the long-range survival of the spotted owl, the court concludes that the decision of the BLM not to supplement the Environmental Impact Statements prepared between 1979 and 1983 was arbitrary and capricious in light of the new, significant, and probably accurate information that the planned logging of spotted owl habitat raises uncertainty about the ability of the spotted owl to survive as a species.

712 F.Supp. 1456, 1485 (D.Or.1989). This court went on, however, to conclude that Section 314 of Pub.L. 100–446, 102 Stat. 1774, 1825 (1988) barred the NEPA claim of plaintiffs. As a result, the court did not order the BLM to comply with the requirements of NEPA. *Id.* at 1488–89.

On September 6, 1989, the United States Court of Appeals for the Ninth Circuit issued a mandate affirming the conclusion of this court that Section 314 barred the NEPA claim of plaintiffs. *Portland Audubon Soc'y v. Lujan,* 884 F.2d 1233 (9th Cir.1989). The Court of Appeals stated that "[t]he district court's finding that plaintiffs' NEPA claim is based on 'new information' is not contested in this appeal. Instead, the argument is focused on whether plaintiffs challenge the plans or 'particular activities to be carried out under the existing plans.'" *Id.* at 1237. The Court

of Appeals affirmed this court's denial of relief to plaintiffs under NEPA, but commented that "if plaintiffs were to succeed on the merits of their NEPA claim, [the] BLM would be required to suspend its management plans and prepare a supplemental EIS, addressing concerns about the northern spotted owl." *Id.* at 1239.

On May 23, 1991, the plaintiffs moved this court for an order allowing them to file an amended complaint in which they reallege their first claim for relief under NEPA challenging certain decisions of the BLM to proceed with logging without preparing Supplemental Environmental Impact Statements to take into account new information concerning the potential extinction of the northern spotted owl. The court denied plaintiffs' motion to file an amended complaint. However, on December 23, 1991, the ruling was reversed by the Court of Appeals with instructions to this court to allow the plaintiffs to file an amended complaint.

On January 29, 1992, the plaintiffs filed an amended complaint for declaratory and injunctive relief in which they allege, in part:

BLM's sale and destruction of habitat suitable for the northern spotted owl and other habitat that may affect the owl, and BLM's adoption of management strategies for the spotted owl that include continued logging of such habitat, constitute major federal actions affecting the quality of the human environment under NEPA.

BLM's sale and destruction of suitable spotted owl habitat, and habitat that may affect owls, causes cumulative, synergistic, and indirect effects that have not been examined in an EIS, nor in any other adequate NEPA document.

Significant new information regarding the habitat requirements of the northern spotted owl has been developed since the preparation of BLM's TMPs and EISs. The decision of the BLM to proceed with continued destruction of such habitat, without preparing an EIS which considers this significant new information regarding the effects of such destruction on the spotted owl, violates NEPA and its implementing regulations, and is subject to judicial review under the APA. Amended Complaint, p. 21, paras. 38–40.

In their amended complaint, the plaintiffs ask the court to "[d]eclare that [the] BLM's sales of timber from spotted owl habitat and from areas that may affect the owl, without an EIS examining new information on the effects of logging on the spotted owl, violates NEPA and its implementing regulations" and to "[i]ssue a … permanent injunction prohibiting [the] BLM from allowing any land-altering operations on any timber sale awarded after January 1, 1992, in spotted owl habitat or … that may affect spotted owls as determined by [the] BLM pursuant to 16 U.S.C. § 1536(a)(2)." Amended Complaint, p. 23, paras. 43(A) and (E).

The BLM is in the process of preparing Resource Management Plans for each of its six western districts. These Resource Management Plans will replace the existing Timber Management Plans and will address, among other issues, the management of all of the habitat of the northern spotted owl administered by the BLM. The process of the BLM in developing these Resource Management Plans has already taken several years and has cost approximately five million dollars.

According to the BLM, the process of developing the Resource Management Plans for its six western districts has taken longer than the BLM expected because of the complexity of the issues relating to the management of northern spotted owl habitat and biological diversity. New information on the northern spotted owl is being addressed in several ways in the development of these Resource Management Plans and Environmental Impact Statements. For example, both the Resource Management Plans and the Environmental Impact Statements based on those plans will analyze an alternative that will provide for the adoption of the report of the Interagency Scientific Committee to address the conservation of the northern spotted owl. This report is entitled "A Conservation Strategy for the Northern Spotted Owl." The

records of decision for the Resource Management Plans and the Environmental Impact Statements now being prepared will not be published before the spring of 1993, according to the present schedule.

The plaintiffs have moved this court to prohibit the defendant from offering or awarding, or allowing any logging operation or land-altering activity to occur in connection with any timber sale not awarded prior to January 1, 1992, that:

A. would log suitable habitat for the northern spotted owl, defined by the U.S. Fish & Wildlife Service (FWS) as follows:

Suitable owl habitat has moderate to high canopy closure (60 to 80 percent); multi-layered, multi-species canopy dominated by large (> 30 inches in diameter at breast height (dbh)) overstory trees; a high incidence of large trees with various deformities (e.g., large cavities, broken tops, dwarf-mistletoe infections, and other evidence of decadence); numerous large snags; large accumulations of fallen trees and other woody debris on the ground; and sufficient open spaces below the canopy for owls to fly.

55 Fed.Reg. 26114, 26116 (1990); or

B. "may affect" the northern spotted owl, as determined by the BLM pursuant to 16 U.S.C. § 1536(a)(2) and implementing regulations thereunder.

Plaintiffs' Motion for TRO and Preliminary Injunction, p. 2.

Plaintiffs seek this preliminary injunction in order to allow this court to consider their motion for the entry of summary judgment and motion for a permanent injunction, which will be filed forthwith.[1]

The issue before the court is whether to grant the plaintiffs' renewed motion for preliminary injunction, which will delay for approximately 60 days the 26 timber sales awarded by the BLM since December 31, 1991 and the approximate 23 timber sales which were to be offered by the BLM for sale during the months of February and

March, 1992, until the court has an opportunity to address the merits of plaintiffs' claim that defendants have violated the requirements of NEPA.

## APPLICABLE STANDARD

The Court of Appeals applies two tests for determining whether to grant a preliminary injunction: the traditional test and the alternative test. *Caribbean Marine Servs. Co. v. Baldrige,* 844 F.2d 668 (9th Cir. 1988). Under the traditional test, the court must consider (1) the likelihood that the moving party will prevail on the merits; (2) whether the balance of irreparable harm favors the moving party; and (3) whether the public interest favors the moving party. *Northern Alaska Envtl. Ctr. v. Hodel,* 803 F.2d 466, 471 (9th Cir.1986).

Under the alternative test, the court must consider (1) whether the motion raises serious questions on the merits; and (2) whether the balance of hardships tips decidedly in favor of the moving party. *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1201 (9th Cir.1980).

This court has ruled that the destruction of owl habitat without compliance with the law is a significant and irreparable injury. *Portland Audubon Soc'y v. Lujan,* Civil No. 87–1160–FR, 1989 WL 29908 (D.Or. March 29, 1989). The Court of Appeals has recognized that the cutting of timber causes irreparable injury and has enjoined the cutting of timber when it occurs without proper observance of the procedures required by NEPA or other environmental laws. *See, e.g., Save the Yaak Comm. v. Block,* 840 F.2d 714, 722 (9th Cir.1988); *Sierra Club v. United States Forest Serv.,* 843 F.2d 1190, 1195–96 (9th Cir.1988).

## CONTENTIONS OF THE PARTIES

Plaintiffs contend that the BLM should be enjoined from selling timber or allowing the cutting of timber in the habitat of the northern spotted owl until the court has the

---

**1.** Plaintiffs agreed to file the motion for summary judgment within 21 days of the hearing date of February 7, 1992.

opportunity to examine and decide the first claim for relief under NEPA on the merits as presented in plaintiffs' motion for summary judgment. Plaintiffs contend that the failure of the BLM to submit its timber sale programs which involve northern spotted owl habitat to public review and scientific comment in an Environmental Impact Statement violates NEPA, and that the court will, upon consideration of the merits, be required to enter a permanent injunction against the BLM in this case.

Plaintiffs contend that they will prevail on the merits of their NEPA claim. Plaintiffs point initially to the ruling of this court on May 18, 1989 that the decision of the State Director of the BLM not to prepare a Supplemental Environmental Impact Statement was arbitrary and capricious in light of new, significant, and probably accurate information that the planned logging of the habitat of the northern spotted owl raises uncertainty about the ability of the northern spotted owl to survive as a species. Plaintiffs further point to the ISC report and the decisions of the Fish and Wildlife Service to list the northern spotted owl under the Endangered Species Act as important decisions which have supported the position that plaintiffs have urged since the initiation of this case—that the actions of the BLM in reliance upon the Timber Management Plans and the Environmental Impact Statements prepared from 1979 to 1983 do not comply with NEPA.

Plaintiffs contend that for this court to order a halt to timber sales of approximately 60 days in order to address the legal issues on the merits will not cause injury to the BLM.

Initially, the BLM contends that this court should not grant injunctive relief to plaintiffs because the Court of Appeals has the power to withdraw its mandate to this court and because the BLM may file a petition for a writ of certiorari to the United States Supreme Court from this opinion.

The BLM next argues that plaintiffs cannot succeed on the merits of their NEPA claim because they fail to identify with certainty in their amended complaint what "final agency action" or actions they are challenging. The BLM contends that the plaintiffs have failed to allege what timber sales awarded by the BLM fail to comply with the requirements of NEPA.

The BLM contends further that the APA and NEPA do not allow the programmatic injunction sought by plaintiffs, and that plaintiffs can only challenge those particular agency actions which allegedly have caused them harm.

The BLM argues that it is entitled to continue to use existing Timber Management Plans and Environmental Impact Statements to manage BLM lands until a new generation of Timber Management Plans and Environmental Impact Statements are completed which reflect the current state of scientific knowledge on the environmental impacts of timber management on the viability of the northern spotted owl. Since the BLM is currently preparing this new generation of Environmental Impact Statements, it contends that it is complying with NEPA by continuing to implement the old plans.

The BLM further contends that the injunction plaintiffs have asked this court to enter will violate the Oregon & California Lands Act, 43 U.S.C. § 1181a, by preventing the BLM from selling the annual statutory minimum of 500 million board feet of timber as set out in that Act.

Finally, the BLM contends that the balance of hardships weighs against plaintiffs because plaintiffs have not shown that any particular timber sale proposed will foreclose the ability of the BLM to provide meaningful protection for the northern spotted owl. The BLM contends that the sales which will be enjoined will further aggravate the timber supply problems of timber mills located in the District of Oregon, and thus wreak havoc to businesses which employ people.

## ANALYSIS

*Success on the Merits*

◼ In *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), the United States Supreme Court stated that the deci-

sion whether to prepare a Supplemental Environmental Impact Statement "is similar to the decision whether to prepare an [Environmental Impact Statement] in the first instance." *Id.* at 374, 109 S.Ct. at 1859. The court explained:

> If there remains "major Federal actio[n]" to occur, and if the new information is sufficient to show that the remaining action will "affec[t] the quality of the human environment" in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared.

*Id.*

This court ruled in May, 1989 that there was new, significant, and probably accurate information so as to require the BLM to address the issue of the effects of its timber sale plans on the long-range survival of the northern spotted owl as a species under NEPA. Nothing has occurred since May, 1989 to relieve the BLM of its obligation under NEPA to examine the environmental impacts of the decisions it made without consideration of the effect of those decisions upon the survival of the northern spotted owl as a species. To date, the BLM has neither addressed the effects of its timber sales on the survival of the northern spotted owl as a species in a NEPA document, nor promised such a NEPA document before mid–1993, at the earliest.

The court finds that plaintiffs have shown a likelihood that they will prevail on their NEPA claim in this case.

*Equities*

Plaintiffs ask the court to halt all timber sales in northern spotted owl habitat on BLM lands until the NEPA issues can be submitted and resolved on the merits. The plaintiffs believe that this process can be completed in approximately 60 days.

The BLM and the intervenors, in turn, ask that this court allow the planned timber sales in northern spotted owl habitat because timber sales are necessary for the economic survival of the timber industry and because the loss of northern spotted owl habitat will have minimal, if any, impact on the survival of the northern spotted owl as a species. They argue that options for providing habitat for northern spotted owls will still be present after all of the sales at issue in this renewed motion for preliminary injunction are sold and logged.

In *Amoco Prod. Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987), the Court stated: "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.* at 545, 107 S.Ct. at 1404.

The court finds that there is evidence which supports plaintiffs' claim that further loss of northern spotted owl habitat will more likely than not have an adverse effect upon the survival of the northern spotted owl as a species. The loss of this habitat is irreparable injury. This is a compelling reason to resolve plaintiffs' claim that the BLM is required to put its timber sales plans to the test of public comment and hearing as required by NEPA prior to allowing any further loss of northern spotted owl habitat.

In *Seattle Audubon Soc'y v. Evans,* 771 F.Supp. 1081 (W.D.Wash.), *aff'd,* 952 F.2d 297 (9th Cir.1991), the Honorable William L. Dwyer, United States District Judge, ordered the Forest Service to revise its standards and guidelines to ensure the viability of the northern spotted owl and to prepare an Environmental Impact Statement. Judge Dwyer enjoined the Forest Service from auctioning or awarding any timber sales in suitable owl habitat until those standards and guidelines were adopted and an Environmental Impact Statement was prepared, a period of time which would be no less than nine months. Judge Dwyer stated:

> The logging of 66,000 acres of owl habitat, in the absence of a conservation plan, would itself constitute a form of irreparable harm. Old growth forests are lost for generations. No amount of money can replace the environmental loss.

While the [Forest Service's] proposal would involve logging an estimated one percent of the remaining habitat, the experts agree that cumulative loss of habitat is what has put the owl in danger of extinction. There is a substantial risk that logging another 66,000 acres, before a plan is adopted, would push the species past a population threshold from which it could not recover.

771 F.Supp. at 1093–94. In conclusion, Judge Dwyer stated:

To bypass the environmental laws, either briefly or permanently, would not fend off the changes transforming the timber industry. The argument that the mightiest economy on earth cannot afford to preserve old growth forests for a short time, while it reaches an overdue decision on how to manage them, is not convincing today. It would be even less so a year or a century from now.

*Id.* at 1096. The Court of Appeals affirmed the ruling of Judge Dwyer. This court is bound by the laws of Congress and judicial precedent.

Unreasonable as it may seem to the timber industry and the many men and women dependent on timber supply for their very livelihood, and unreasonable as it may seem to the counties which receive funds from timber harvests pursuant to the Oregon & California Lands Act, the law will allow no less in this case. The probability of irreparable injury is serious enough to outweigh any adverse effects from the issuance of the injunction delaying the planned timber sales until the merits of plaintiffs' NEPA claim can be addressed in plaintiffs' motion for summary judgment.

## CONCLUSION

Plaintiffs' motion for renewed preliminary injunction (# 682) is granted. The injunction shall remain in effect until this court has addressed the issue on the merits in plaintiffs' motion for summary judgment. Plaintiffs shall file their motion for summary judgment within 21 days of the date of the February 7, 1992 preliminary

injunction hearing. This court will expedite the resolution of that motion.