PORTLAND AUDUBON SOCIETY, Headwaters, the Wilderness Society, Sierra Club, Inc., Siskiyou Audubon Society, Central Oregon Audubon Society, Kalmiopsis Audubon Society, Salem Audubon Society, Umpqua Valley Audubon Society, Natural Resources Defense Council, Lane County Audubon Society, and Oregon Natural Resources Council, Plaintiffs,

v.

Manuel LUJAN, in his official capacity as Secretary, United States Department of Interior, Defendant,

and

Northwest Forest Resource Council, Huffman & Wright Logging Co., Freres Lumber Co., Inc., Lone Rock Timber Co., Inc., Scott Timber Co., Clear Lumber Manufacturing Corp., Yoncalla Timber Products, Inc., Cornett Lumber Company, Inc., Association of O & C Counties and Benton County, Douglas County Forest Products Company, Medford Corporation, Rogge Forest Products, Inc., Defendants–Intervenors.

Civ. No. 87–1160–FR.

United States District Court,
D. Oregon.

June 8, 1992.

1490

Victor M. Sher, Todd D. True, Sierra Club Legal Defense Fund, Inc., Seattle, Wash., for plaintiffs Portland Audubon Soc., Headwaters, The Wilderness Soc., Sierra Club, Inc., Siskiyou Audubon Soc., Cent. Oregon Audubon Soc., Kalmiopsis Audubon Soc., Salem Audubon Soc., Umpqua Valley Audubon Soc., and Natural Resources Defense Council.

Michael D. Axline, John E. Bonine, Western Environmental Law Clinic, Eugene, Or., for plaintiffs Lane County Audubon Soc. and Oregon Natural Resources Council.

Charles H. Turner, U.S. Atty., Lance A. Caldwell, Asst. U.S. Atty., Roger W. Nesbit, Special Asst. U.S. Atty., Portland, Or., for defendant.

Mark C. Rutzick, Preston Thorgrimson Shidler Gates & Ellis, Portland, Or., for defendant-intervenors Northwest Forest Resource Council, Huffman & Wright Logging Co., et al., and Douglas County Forest Products, et al.

Phillip D. Chadsey, Kevin Q. Davis, Stoel Rives Boley Jones & Grey, Portland, Or., for defendant-intervenor Ass'n of O & C Counties and Benton County.

## OPINION

FRYE, District Judge:

The matters before the court are 1) the renewed motion of plaintiffs for summary judgment (# 739); and 2) the motion of defendant to vacate preliminary injunction (# 755).

## FACTS

Between 1979 and 1983, the Bureau of Land Management (BLM) formulated a ten-year Timber Management Plan for each of its seven western districts in the State of Oregon. In these Timber Management Plans, the BLM has designated the commercial forest land which is under its management for one of several uses. In these Timber Management Plans, the BLM does not designate specific timber sale boundaries or require that any particular stand of timber be harvested. Rather, the BLM has decided the land use allocation

and set the annual allowable harvest for each district in the Timber Management Plans.

These seven Timber Management Plans were accompanied by seven Environmental Impact Statements. The information reviewed by the BLM in each of these Environmental Impact Statements indicates that the logging of old growth forests will result in a decline in the number of northern spotted owls inhabiting BLM lands in western Oregon. None of the Timber Management Plans addresses the effect of the decline in the number of northern spotted owls inhabiting BLM lands in western Oregon on the survivability of the subspecies.

Based upon the information available to the BLM as discussed in the Timber Management Plans and in each of the Environmental Impact Statements, the seven western districts of the BLM adopted management plans which established habitat areas for the northern spotted owl (SOHA). Logging was restricted in these SOHAs. Each SOHA was intended to support one to three pairs of northern spotted owls.

After the BLM completed the Environmental Impact Statements for each of its seven western districts in the State of Oregon, a number of scientific studies and analyses concerning the habitat requirements for the northern spotted owl were released, including 1) a status review of the northern spotted owl by the United States Fish and Wildlife Service (1982); 2) a draft of a Supplemental Environmental Impact Statement prepared by the United States Forest Service in which an analysis of the habitat requirements of the northern spotted owl is made (1986); 3) a study of the northern spotted owl undertaken by a "blue ribbon" panel of scientists for the National Audubon Society (1986); 4) analyses of the population demographics and viability of the northern spotted owl prepared by Dr. Russell Lande (1985 and 1987); and 5) analyses of the northern spotted owl prepared by a team of BLM biologists (May 8, 1986, January 16, 1987, and May 8, 1987).

In response to requests by environmental groups for it to review the significance of the new scientific studies and analyses concerning the habitat requirements of the northern spotted owl, the BLM decided to prepare an Environmental Assessment to allow it to determine whether the Environmental Impact Statements it had prepared between 1979 and 1983 for the Timber Management Plans should be supplemented.

On February 3, 1987, the Environmental Assessment was completed. In the Environmental Assessment, the BLM concluded that the new scientific studies and analyses concerning the habitat requirements of the northern spotted owls were preliminary in nature, and that these studies and analyses were not such as to cause the BLM to believe that the consequences to the northern spotted owl subspecies as a result of the planned timber sales would be worse than originally predicted in the existing Environmental Impact Statements.

On April 10, 1987, the Oregon Director of the BLM issued a decision not to supplement the current Environmental Impact Statements because he concluded that the new scientific information regarding the effects on the northern spotted owl subspecies of continued logging in these habitat areas was "not significant."

On October 19, 1987, the plaintiffs, Portland Audubon Society, Headwaters, The Wilderness Society, Sierra Club, Inc., Siskiyou Audubon Society, Central Oregon Audubon Society, Kalmiopsis Audubon Society, Salem Audubon Society, Umpqua Valley Audubon Society, and Natural Resources Defense Council filed this action alleging violations by the defendant, Manual Lujan, in his official capacity as Secretary of the United States Department of Interior, of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.;* the Oregon & California Lands Act (O & C Act), 43 U.S.C. § 1181a *et seq.;* the Federal Lands Policy and Management Act (FLPMA), 43 U.S.C. § 1701 *et seq.;* the Migratory Bird Treaty Act (MBTA), 16 U.S.C. § 703 *et seq.;* and the Administrative Procedures Act (APA), 5 U.S.C. § 553 *et seq.*

In their first claim for relief, the plaintiffs alleged that the decision of the Oregon Director of the BLM on April 10, 1987 not to prepare a Supplemental Environmental Impact Statement prior to the completion of the Environmental Impact Statement, which was expected at that time to be completed by the fall of 1990, violated the requirements of NEPA.

On December 21, 1987, Congress enacted Section 314 of the Department of the Interior and Related Agencies Appropriations Act, Pub.L. No. 100–446, 102 Stat. 1774, 1825 (1988), which barred certain environmental challenges to timber sales.

On November 17, 1988, the United States District Court for the Western District of Washington held that the United States Forest Service had acted in an arbitrary and capricious manner and contrary to law in failing to review and make an express finding on the issue of whether the northern spotted owl was a threatened subspecies. *Northern Spotted Owl v. Hodel*, 716 F.Supp. 479 (W.D.Wash.1988).

On May 18, 1989, this court filed an opinion, in which it concluded:

The Environmental Impact Statements prepared between 1979 and 1983 do not address the issues of adequate population size or the effects of habitat fragmentation upon the long-range survival of the spotted owl species. Neither does the Spotted Owl Environmental Assessment prepared in 1987. This is a significant omission from the Spotted Owl Environmental Assessment in light of the new information available at the time it was prepared.

Since the Spotted Owl Environmental Assessment does not address the critical issues of adequate population size and the effects of habitat fragmentation upon the long-range survival of the spotted owl, the court concludes that the decision of the BLM not to supplement the Environmental Impact Statements prepared between 1979 and 1983 was arbitrary and capricious in light of the new, significant, and probably accurate information that the planned logging of spotted owl habitat raises uncertainty about

the ability of the spotted owl to survive as a species.

*Portland Audubon Soc'y v. Lujan*, 712 F.Supp. 1456, 1485 (D.Or.1989). This court concluded, however, that Section 314, as initially enacted on December 21, 1987, and reenacted without change on September 27, 1988, barred the NEPA claim of plaintiffs, and therefore the court did not order the BLM to comply with the requirements of NEPA. *Id.* at 1488–89.

On June 23, 1989, the United States Fish and Wildlife Service proposed listing the northern spotted owl as a threatened species under the Endangered Species Act, 16 U.S.C. § 1531 *et seq.* *See* 54 Fed.Reg. 26666.

On September 6, 1989, the United States Court of Appeals for the Ninth Circuit issued a mandate affirming the conclusion of this court that Section 314 barred the NEPA claim of plaintiffs. *Portland Audubon Soc'y v. Lujan*, 884 F.2d 1233 (9th Cir.1989), *cert. denied*, 494 U.S. 1026, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1990). The Court of Appeals stated in its opinion that "[t]he district court's finding that plaintiffs' NEPA claim is based on 'new information' is not contested in this appeal. Instead, the argument is focused on whether plaintiffs challenge the plans or 'particular activities to be carried out under the existing plans.'" *Id.* at 1237. The Court of Appeals affirmed this court's denial of relief to plaintiffs under NEPA. The court stated that "if plaintiffs were to succeed on the merits of their NEPA claim, [the] BLM would be required to suspend its management plans and prepare a supplemental EIS, addressing concerns about the northern spotted owl." *Id.* at 1239. The Court of Appeals, however, reversed the order of this court dismissing plaintiffs' claims brought under the MBTA, the O & C Act, and the FLPMA and remanded the action for further proceedings.

On October 23, 1989, the Interagency Scientific Committee to Address the Conservation of the Northern Spotted Owl was formed to develop a scientifically credible conservation strategy for the northern spotted owl. The Interagency Scientific

Committee was established under the authority of an interagency agreement between the United States Forest Service, the BLM, the United States Fish and Wildlife Service and the National Park Service. The charter of the Interagency Scientific Committee was signed by the heads of the various governmental agencies and subsequently incorporated into the Department of the Interior and Related Agencies Appropriations Act for Fiscal Year 1990, Pub.L. No. 101–121, 103 Stat. 701, 745–50 (1989) (Section 318).

In a further provision of Section 318, which went into effect on October 23, 1989, the Congress specifically referred to this action as follows:

> Without passing on the legal and factual adequacy of ... the December 22, 1987 agreement between the Bureau of Land Management and the Oregon Department of Fish and Wildlife for management of the spotted owl, the Congress hereby determines and directs that management of areas according to subsections ... (b)(5) of this section on ... Bureau of Land Management lands in western Oregon known to contain northern spotted owls is adequate consideration for the purpose of meeting the statutory requirements that are the basis for ... the case *Portland Audubon Society et al., v. Manuel Lujan, Jr.,* Civil No. 87–1160–FR. *The guidelines adopted by subsections ... (b)(5) of this section shall not be subject to judicial review by any court of the United States.*

Section 318(b)(6)(A) (emphasis added).

On December 21, 1989, this court granted the motion of the government to dismiss all claims pursuant to Section 318 and entered judgment for the BLM based upon the conclusion of the court that Section 318 barred this action despite the constitutional challenge of the Portland Audubon Society to Section 318. *Portland Audubon Soc'y v. Lujan,* 1989 WL 155694, 21 Envtl.L.Rep. 20,018 (D.Or. Dec. 21, 1989).

In May of 1990, the Interagency Scientific Committee issued its Final Report, in which it concluded that the lack of consistent planning strategy has resulted in a high risk of extinction for the northern spotted owl subspecies.

In June of 1990, the United States Fish and Wildlife Service listed the northern spotted owl as a threatened species pursuant to the Endangered Species Act. *See* 55 Fed.Reg. 26189 (June 26, 1990). The United States Fish and Wildlife Service concluded that "[e]xisting regulatory mechanisms are insufficient to protect either the northern spotted owl or its habitat." *Id.* at 26190.

In September, 1990, following the issuance of the report of the Interagency Scientific Committee and the decision of the United States Fish and Wildlife Service to list the northern spotted owl subspecies under the Endangered Species Act, the BLM, which manages a significant amount of the remaining old growth forests suitable for northern spotted owl habitat, issued a document entitled "Management Guidelines for the Conservation of the Northern Spotted Owl, FY 1991 through 1992," also referred to as the "Jamison Strategy," to protect the northern spotted owl subspecies and to provide for continued logging in northern spotted owl habitat. The BLM did not prepare an Environmental Assessment or an Environmental Impact Statement relating to the Jamison Strategy. Pursuant to the Jamison Strategy, the BLM was to offer approximately 750 million board feet of timber, to be harvested from approximately 190 timber sales, in each of the fiscal years 1991 and 1992, including a significant number of timber sales which were located in northern spotted owl habitat.

On October 30, 1990, the Court of Appeals reversed this court's entry of judgment for the BLM in this action, finding that subsection (b)(6)(A) of Section 318 was unconstitutional in that it violated the doctrine of the separation of powers. The action was then remanded to this court for further proceedings. *Seattle Audubon Soc'y v. Robertson,* 914 F.2d 1311 (9th Cir. 1990).

On May 23, 1991, the United States District Court for the Western District of Washington ordered the United States For-

est Service to prepare revised standards and guidelines to ensure the viability of the northern spotted owl subspecies, together with an Environmental Impact Statement, and enjoined logging in all suitable owl habitat on Forest Service lands until such standards and guidelines were adopted. *Seattle Audubon Soc'y v. Evans*, 771 F.Supp. 1081 (W.D.Wash.), *aff'd*, 952 F.2d 297 (9th Cir.1991).

On May 23, 1991, plaintiffs filed a motion to file an amended complaint in order to reallege their first claim for relief under NEPA. Plaintiffs sought to challenge certain decisions that the BLM made to proceed with logging in northern spotted owl habitat without preparing Supplemental Environmental Impact Statements to take into account new information concerning the potential for extinction of the northern spotted owl subspecies. This court denied the motion of plaintiffs to file an amended complaint on the grounds that Section 318 remained in effect, and thus was a bar to plaintiffs' NEPA claim.

Pursuant to Section 7(a)(2) of the Endangered Species Act, the BLM was required to submit its proposed 1991 timber sales to the United States Fish and Wildlife Service for review. On June 17, 1991, the United States Fish and Wildlife Service concluded that 52 of the timber sales that the BLM proposed to offer pursuant to the Jamison Strategy for fiscal year 1991 were likely to jeopardize the survival of the northern spotted owl subspecies. The United States Fish and Wildlife Service reviewed the remaining proposed sales for fiscal year 1991 pursuant to the requirements of the Endangered Species Act and made a finding that these proposed sales did not create jeopardy to the survival of the northern spotted owl subspecies under the Endangered Species Act.

On September 11, 1991, the United States District Court for the District of Oregon in *Lane County Audubon Soc'y v. Jamison*, No. 91–6123–JO, 1991 WL 354885 1991 U.S. Dist. LEXIS 20050 (Sept. 11, 1991), *aff'd in part and remanded in part*, 958 F.2d 290 (9th Cir.1992), held that the BLM violated the Endangered Species

Act by failing to consult with the United States Fish and Wildlife Service concerning the potential effects of the Jamison Strategy on the survival of the northern spotted owl subspecies and permanently enjoined the BLM from implementing the Jamison Strategy until it completed its consultation with the United States Fish and Wildlife Service.

On December 23, 1991, the Court of Appeals reversed this court's conclusion that Section 318 remained in effect to bar the NEPA claim of plaintiffs and remanded the case to this court with instructions to allow plaintiffs to file an amended complaint. *Seattle Audubon Soc'y v. Evans*, 952 F.2d 297 (9th Cir.1991).

On January 29, 1992, plaintiffs filed an amended complaint for declaratory and injunctive relief alleging, in part:

BLM's sale and destruction of habitat suitable for the northern spotted owl and other habitat that may affect the owl, and BLM's adoption of management strategies for the spotted owl that include continued logging of such habitat, constitute major federal actions affecting the quality of the human environment under NEPA.

BLM's sale and destruction of suitable spotted owl habitat, and habitat that may affect owls, causes cumulative, synergistic, and indirect effects that have not been examined in an EIS, nor in any other adequate NEPA document.

Significant new information regarding the habitat requirements of the northern spotted owl has been developed since the preparation of BLM's, TMPs and EISs. The decision of the BLM to proceed with continued destruction of such habitat, without preparing an EIS which considers this significant new information regarding the effects of such destruction on the spotted owl, violates NEPA and its implementing regulations, and is subject to judicial review under the APA.

Amended Complaint, p. 21, paras. 38–40.

In their amended complaint, plaintiffs request that the court "[d]eclare that BLM's sales of timber from spotted owl habitat and from areas that may affect the owl,

without an EIS examining new information on the effects of logging on the spotted owl, violates NEPA and its implementing regulations" and "[i]ssue a ... permanent injunction prohibiting BLM from allowing any land-altering operations on any timber sale awarded after January 1, 1992, in spotted owl habitat or ... that may affect spotted owls as determined by BLM pursuant to 16 U.S.C. § 1536(a)(2)." *Id.* at p. 23, paras. 43(A) and (E).

On January 29, 1992, plaintiffs filed a motion for a renewed preliminary injunction to prohibit the BLM from offering or awarding, or allowing any logging operation or land-altering activity to occur in connection with any timber sale not awarded prior to January 1, 1992. The court found that the plaintiffs had shown a likelihood that they would prevail on their NEPA claim, and that the probability of irreparable injury to them outweighed any adverse effects from the issuance of an injunction. The court entered an injunction pending the resolution of plaintiffs' motion for summary judgment on the NEPA claim as follows:

IT IS HEREBY ORDERED that ... [f]ederal defendants (collectively, the BLM) are hereby enjoined from offering or awarding, or allowing any logging operations or land-altering activities to occur in connection with, any timber sale not awarded prior to 1992 that:

A. would log suitable habitat for the northern spotted owl, defined by the U.S. Fish & Wildlife Service (FWS) as follows:

Suitable owl habitat has moderate to high canopy closure (60 to 80 percent); multi-layered, multi-species canopy dominated by large (> 30 inches in diameter at breast height (dbh)) overstory trees; a high incidence of large trees with various deformities (e.g., large cavities, broken tops, drawf-mistletoe infections, and other evidence of decadence); numerous large snags; large accumulations of fallen trees and other woody debris on the ground; and sufficient open spaces below the canopy for owls to fly.

55 Fed.Reg. 26114, 26116 (1990); or

B. "may affect" the northern spotted owl, as determined by the BLM pursuant to 16 U.S.C. § 1536(a)(2) and implementing regulations thereunder.

Order Granting Plaintiffs' Motion for Renewed Preliminary Injunction, pp. 3–4.

On March 25, 1992, the United States Supreme Court reversed the decision of the Court of Appeals in *Seattle Audubon Soc'y v. Robertson*, 914 F.2d 1311 (9th Cir. 1990). In *Robertson v. Seattle Audubon Soc'y*, — U.S. —, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992), the Supreme Court rejected the determination of the Court of Appeals that Section 318 was unconstitutional because it violated the doctrine of separation of powers. The Supreme Court found that Section 318 did not violate the doctrine of separation of powers of the United States Constitution because it amended applicable law. The Supreme Court remanded the case to the Court of Appeals for further proceedings.

Since May 18, 1989, when this court ruled that the decision of the BLM not to prepare a Supplemental Environmental Impact Statement was arbitrary and capricious, additional scientific information regarding the northern spotted owl subspecies has been prepared. This information includes 1) a proposal by the United States Fish and Wildlife Service in June, 1989 to add the northern spotted owl subspecies to the list of protected species under the Endangered Species Act, 16 U.S.C. § 1531 *et seq.;* 2) a status review of the northern spotted owl by the United States Fish and Wildlife Service prepared in 1990; 3) a report entitled "A Conservation Strategy for the Northern Spotted Owl" prepared in May, 1990 by the Interagency Scientific Committee to Address the Conservation of the Northern Spotted Owl; 4) the final decision of the United States Fish and Wildlife Service to add the northern spotted owl subspecies to the list of protected species under the Endangered Species Act; 5) a report to the Agriculture Committee and the Merchant Marine and Fisheries Committee of the United States House of Representatives on October 8, 1991 entitled "Alternatives for Management of Late-

Successional Forests of the Pacific Northwest;" and 6) a Final Environmental Impact Statement on Management for the Northern Spotted Owl in the National Forests issued in early 1992 and prepared pursuant to an order issued by the United States District Court for the Western District of Washington in *Seattle Audubon Soc'y v. Evans*, 771 F.Supp. 1081 (W.D.Wash.), *aff'd*, 952 F.2d 297 (9th Cir. 1991).

The BLM is in the process of preparing Resource Management Plans for each of its six western districts which will replace the current Timber Management Plans, and which will address, among other issues, management of all of the areas of habitat of the northern spotted owl subspecies administered by the BLM. The process of the BLM in developing these Resource Management Plans has already taken several years. The BLM has spent approximately five million dollars in its efforts to prepare these Resource Management Plans.

The process of developing these Resource Management Plans has taken the BLM longer than expected because of the complexity of issues, such as biological diversity and how to manage the habitat areas of the northern spotted owl subspecies. New information on the northern spotted owl subspecies is addressed in several ways in the Resource Management Plans and the Environmental Impact Statements. For example, both the Resource Management Plans and the Environmental Impact Statements will analyze an alternative that will provide for the adoption of the report of the Interagency Scientific Committee to Address the Conservation of the Northern Spotted Owl which is entitled "A Conservation Strategy for the Northern Spotted Owl." The records of decision for the Resource Management Plans and the Environmental Impact Statements now being prepared are expected to be completed by the middle of 1993.

## CONTENTIONS OF THE PLAINTIFFS

Plaintiffs move the court for an order of summary judgment in their favor and against the BLM on their NEPA claim. Plaintiffs rely upon the prior finding of this court that the Environmental Impact Statements developed between 1979 and 1983 fail to address "the issues of adequate population size or the effects of habitat fragmentation upon the long-range survival of the spotted owl species;" that this failure represented a "significant omission;" and that the decision not to supplement the existing Environmental Impact Statements in 1987 was "arbitrary and capricious in light of the new, significant, and probably accurate information that the planned logging of spotted owl habitat raises uncertainty about the ability of the spotted owl to survive as a species." *Portland Audubon Soc'y v. Lujan*, 712 F.Supp. 1456, 1485 (D.Or.1989).

Plaintiffs contend that this court was correct in concluding that the refusal of the BLM to consider new, significant information was arbitrary and capricious and an abuse of discretion. Plaintiffs argue that the developments in the scientific community, and the lack of management activities by the BLM since May 18, 1989 when the court rendered its decision, confirm the need for a Supplemental Environmental Impact Statement. Plaintiffs point out that the BLM has no long-term strategy for the survival of the northern spotted owl subspecies, and this confirms the need for a Supplemental Environmental Impact Statement. Plaintiffs further contend that testimony given by experts from the Environmental Protection Agency, the United States Fish and Wildlife Service, and the BLM also confirm the need for a Supplemental Environmental Impact Statement.

Plaintiffs point out that the BLM has never examined in an Environmental Impact Statement its management strategies for the northern spotted owl subspecies and for timber production and has ignored its obligations under NEPA to address the implications of significant, new information about the northern spotted owl subspecies in a Supplemental Environmental Impact Statement. Plaintiffs assert that this court should order the BLM to prepare a Supplemental Environmental Impact Statement

and should enjoin any further logging in habitat areas of the northern spotted owl subspecies until the obligations of the BLM under NEPA are fulfilled.

## CONTENTIONS OF THE BLM

The BLM contends that this court should deny the motion of plaintiffs for summary judgment on the grounds that there are genuine issues of material fact with regard to the question of the BLM's compliance with NEPA as to each of the timber sales that has thus far been prepared by the BLM, has been found not to create jeopardy to the northern spotted owl subspecies under the Endangered Species Act, and has been otherwise cleared for sale.

The BLM argues initially that whether this court has jurisdiction at this time is questionable because the United States Supreme Court has reversed the decision of the Court of Appeals, which reversed the order of dismissal filed by this court, and has remanded this case to the Court of Appeals. Should the Court of Appeals reinstate the final judgment of this court which dismisses the case, the BLM argues that the proceedings now being conducted will be rendered meaningless.

The BLM further argues that plaintiffs cannot succeed on the merits of their NEPA claim because they have failed to identify with certainty in their amended complaint the "final agency action" or actions they are challenging. The BLM contends that since plaintiffs have failed to allege which timber sales awarded by the BLM fail to comply with NEPA, the APA and NEPA do not allow the programmatic injunction sought by plaintiffs, and that plaintiffs can at this point in these proceedings only challenge those particular actions of the BLM which allegedly have caused them harm.

The BLM contends that it is entitled to continue to use the existing Timber Management Plans and Environmental Impact Statements to manage BLM lands until a new generation of Timber Management Plans and Environmental Impact Statements which reflect the current state of scientific knowledge as to the environ-

mental impacts of timber management on the viability of the northern spotted owl subspecies are completed. Since the BLM is in the process of preparing the new generation of Environmental Impact Statements, it argues that it is complying with the terms of NEPA by continuing to implement the old plans.

The BLM contends that plaintiffs have failed to make any showing that the BLM's compliance with NEPA is inadequate for continued implementation of the Timber Management Plans; that the alleged "new information" of plaintiffs is either probably not accurate or does not significantly alter the environmental impacts as they were described in the existing NEPA documents; and that the BLM has complied with NEPA with regard to each of the timber sales that plaintiffs are challenging.

Finally, the BLM contends that plaintiffs are not entitled to the relief they request even if this court finds that the BLM has violated the terms of NEPA. The BLM asserts that the injunction plaintiffs have requested will violate the terms of the O & C Act, 43 U.S.C. § 1181a *et seq.*, by preventing the BLM from selling the annual statutory minimum of 500 million board feet of timber as set out in the O & C Act, and that the equities counsel against the general injunction sought by plaintiffs.

## APPLICABLE STANDARD

■ Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact.

■ Once the initial burden of the moving party is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The non-moving party must make a sufficient showing on all essential elements of

the case with respect to which the non-moving party has the burden of proof. *Id.*

## APPLICABLE LAW

Section 101 of NEPA is a declaration of a broad national commitment to protecting and promoting environmental quality. 42 U.S.C. § 4331. Section 102 of NEPA provides, in pertinent part:

The Congress authorizes and directs that, to the fullest extent possible ... (2) all agencies of the Federal Government shall—

....

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332.

In *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989), the Supreme Court explained that:

The statutory requirement that a federal agency contemplating a major action prepare such an environmental impact statement serves NEPA's "action-forcing" purpose in two important respects. It ensures that the agency, in reaching its decision, will have available and will carefully consider detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play

a role in both the decisionmaking process and the implementation of that decision.

Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast....

Publication of an EIS, both in draft and final form, also serves a larger informational role. It gives the public the assurance that the agency "has indeed considered environmental concerns in its decisionmaking process," and, perhaps more significantly, provides a springboard for public comment.

*Id.* 109 S.Ct. at 1845 (citations omitted).

In *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), the Supreme Court examined the subject of "post-decision supplemental environmental impact statements" and explained:

The subject of post-decision supplemental environmental impact statements is not expressly addressed in NEPA. Preparation of such statements, however, is at times necessary to satisfy the Act's "action-forcing" purpose. NEPA does not work by mandating that agencies achieve particular substantive environmental results. Rather, NEPA promotes its sweeping commitment to "prevent or eliminate damage to the environment and biosphere" by focusing government and public attention on the environmental effects of proposed agency action. By so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct. Similarly, the broad dissemination of information mandated by NEPA permits the public and other government agencies to react to the effects of a proposed action at a meaningful time. It would be incongruous with this approach to environmental protection, and with the Act's manifest concern with preventing uninformed action, for the blinders to adverse environmental effects, once un-

equivocally removed, to be restored prior to the completion of agency action simply because the relevant proposal has received initial approval....

... The [Council on Environmental Quality] regulations ... impose a duty on all federal agencies to prepare supplements to either draft or final EIS's if there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." ...

[A]n agency should apply a "rule of reason".... [A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made. On the other hand, and as the Government concedes, NEPA does require that agencies take a "hard look" at the environmental effects of their planned action, even after a proposal has received initial approval. Application of the "rule of reason" thus turns on the value of the new information to the still pending decisionmaking process. In this respect the decision whether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance: If there remains "major Federal actio[n]" to occur, and if the new information is sufficient to show that the remaining action will "affec[t]" the quality of the human environment" in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared.

*Id.* 109 S.Ct. at 1857–59 (citations and footnotes omitted).

## ISSUE PRESENTED

The issue before the court is and has always been whether the decision of the BLM on April 10, 1987 not to supplement the Environmental Impact Statements it prepared between 1979 and 1983 was "arbitrary and capricious in light of the new, significant, and probably accurate information that the planned logging of spotted owl habitat raises uncertainty about the ability of the spotted owl to survive as a species." *Portland Audubon Soc'y v. Lujan,* 712 F.Supp. 1456, 1485 (D.Or.1989).

## ANALYSIS

■ On May 18, 1989, this court ruled that there was new, significant, and probably accurate information which required the BLM to address the issue of the effects of its timber sale plans on the long-range survival of the northern spotted owl as a species under NEPA. Congress saw fit to amend the obligation of the BLM to comply with the terms of NEPA by enacting Section 314 in December of 1987 and reenacting Section 314 in subsequent appropriations measures. The Court of Appeals has concluded, however, that the protection of Sections 314 and 318 is no longer in effect, and therefore the provisions of NEPA apply to the actions of the BLM. *Seattle Audubon Soc'y v. Evans,* 952 F.2d 297 (9th Cir.1991).

Nothing has occurred in the scientific arena since May, 1989 to relieve the BLM of its obligation under NEPA to reexamine the environmental impacts of the decisions it made from 1979 to 1983 without consideration of the survival of the northern spotted owl as a subspecies. The developments in the scientific community have only confirmed the need for a Supplemental Environmental Impact Statement.

In the opposition filed by the BLM to plaintiffs' Statement of Material Facts Not in Dispute, the BLM states:

The BLM admits that some responsible experts in population ecology and related disciplines believe that new information shows that the SOHA strategy is inadequate to preserve the northern spotted owl subspecies. However, the Affidavit of Joseph B. Lint and testimony of Jack Ward Thomas, both members of the ISC, contravene the implication that this new information would require the immediate adoption of the ISC strategy in order to avoid the extirpation of the species. The Affidavit of E. Linwood Smith also contravenes the intimation of the plaintiffs

that continued management under the BLM's Timber Management Plans as contemplated by the BLM pending its new resource management plans will threaten the northern spotted owl subspecies with imminent extinction.

BLM admits that some experts believe that the "ISC strategy may not prove to be adequate to preserve the spotted owl as a species; [and] these scientists criticize the ISC strategy as over-optimistic and risky." However, other qualified experts believe that the ISC's conservation strategy is more that sufficiently protective. Any assertion that all qualified experts in population ecology and related disciplines believe the ISC strategy may not prove adequate to conserve the spotted owl has been controverted.

BLM admits that some experts in population ecology and related disciplines believe that any further habitat loss could severely compromise the possibility that the northern spotted owl will survive. However, other qualified experts believe that Dr. Barry Noon's predictions about the fate of the northern spotted owl are in error, that the northern spotted owl is not in danger of extinction, and that BLM is responsibly conducting forest management activities in a manner that will not jeopardize the continued existence of the northern spotted owl. Therefore, any assertion that any continuation of forest management activities jeopardize the continued existence of the northern spotted owl is controverted by BLM's own experts.

*Id.* at pp. 6–7, paras. 4–6 (citations to the record omitted).

■ The purpose of requiring an Environmental Impact Statement under NEPA is to ensure that before taking federal action an agency will have available and will carefully consider detailed information concerning the significant environmental impacts of its actions. The publication of an Environmental Impact Statement is intended to give the public the assurance that the agency has indeed considered environmental concerns and to provide the public an opportunity for comment. *Robertson v. Methow Valley Citizens Council,* 109 S.Ct.

at 1845. The purpose of a "post-decision supplemental environmental impact statement[ ]" is to "ensure[ ] that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh v. Oregon Natural Resources Council,* 109 S.Ct. at 1857–58.

In this case, the BLM made certain decisions in the Timber Management Plans prepared from 1979 to 1983. Those decisions involved actions which were to be taken by the BLM over a period of more than a decade. Within that decade, new information developed as to the effects of the planned actions of the BLM on the long-range survival of the northern spotted owl subspecies. The BLM admits that expert opinion varies and that "some responsible experts in population ecology and related disciplines believe that new information shows that the SOHA strategy [which is the basis for the 1979 to 1983 Timber Management Plans] is inadequate to preserve the northern spotted owl subspecies." BLM's Opposition to Plaintiffs' Statement of Material Facts Not in Dispute, p. 6.

The situation that the BLM is in is precisely the situation in which a Supplemental Environmental Impact Statement is necessary. More than a decade after the environmental impacts of the Timber Management Plans were assessed, the BLM has neither addressed the effects of its timber sales on the survival of the northern spotted owl as a subspecies in a NEPA document, nor promised such a NEPA document until mid–1993 at the earliest.

The "rule of reason," *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), requires that the BLM carefully consider detailed information concerning significant environmental impacts and allow the public an opportunity to comment prior to taking any further actions which could adversely affect the habitat of the northern spotted owl subspecies. Major federal action is still contemplated under the 1979 to 1983 Timber Management Plans, and the new information regarding the effects of continued logging in the habitat of the northern

spotted owl on the survival of the subspecies is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered by the BLM.

It is not up to the court to evaluate or to discount the opinions of responsible experts in a scientific field. It is the duty of the BLM to identify, evaluate and address the new information, allow public comment, and formulate its plans accordingly. The only credible conclusion to be reached in this controversy, regardless of which "responsible experts" the court chooses to believe, is that NEPA requires the public to be involved, and the BLM has not followed procedures to allow the public to be involved. The continued sale of timber in the habitat of the northern spotted owl subspecies under the 1979 to 1983 Timber Management Plans without a Supplemental Environmental Impact Statement which examines the impact of these sales on the survival of the northern spotted owl subspecies violates NEPA.

The BLM contends, however, that even if the court finds that NEPA is being violated, there are several reasons why this court cannot provide plaintiffs with the relief they request and that this court has ordered in the preliminary injunction. The court will examine each of these reasons.

### 1) *The Remand to the Court of Appeals*

■ Initially, the BLM argues that the decision of the Supreme Court in *Robertson v. Seattle Audubon Soc'y,* —— U.S. ——, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992), requires reinstatement of the earlier order of dismissal of this action.

In *Robertson,* the Supreme Court reversed the decision of the Court of Appeals, which holds that Section 318 of the Department of the Interior and Related Agencies Appropriations Act of 1990 is unconstitutional. The Supreme Court concluded that Section 318 is constitutional in that it "compelled changes in law, not findings or results" in particular cases. *Id.* 112 S.Ct. at 1413.

The Supreme Court expressly stated that Section 318 "expired automatically on September 30, 1990, the last day of Fiscal Year 1990, except that timber sales offered under § 318 were to remain subject to its terms for the duration of the applicable sales contracts." *Id.* 112 S.Ct. at 1410–11. This interpretation of the effect of Section 318 by the Supreme Court is consistent with the conclusion of the Court of Appeals that Section 318 expired at the end of fiscal year 1990 and that plaintiffs should be granted leave to amend their complaint to allege NEPA claims no longer barred by Section 318. *Seattle Audubon Soc'y v. Evans,* 952 F.2d 297 (9th Cir.1991).

■ Pursuant to the decision of the Court of Appeals, plaintiffs filed an amended complaint on January 29, 1992, which includes a renewed NEPA claim. The NEPA claim is now before this court, and nothing in the decision of the Supreme Court in *Robertson* requires that the amended complaint be dismissed.[1]

### 2) *Final Agency Action*

■ The BLM contends that plaintiffs cannot succeed on the merits of their NEPA claim because they have failed to identify with certainty in their amended complaint what final agency action or actions they are challenging. The BLM argues that the decision of the Supreme Court in *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (*Lujan*), compels this court to find that there is no final agency action subject to judicial review in this case, and that any injunctive relief ordered by this court must be limited to those timber sales which have been shown to cause specific harm.

---

1. The BLM asserts that the six-year statute of limitations in 28 U.S.C. § 2401(a) bars any challenge to the administrative decisions made in the Timber Management Plans for the years 1979 to 1983. This action was filed on October 19, 1987 challenging the decision of the BLM of April 10, 1987 not to prepare a Supplemental Environmental Impact Statement. This action was timely filed and is not barred by 28 U.S.C. § 2401(a).

The BLM explains that there are some 78 timber sales that have been planned, reviewed and approved and are subject to plaintiffs' action herein. The BLM contends that there is no single "final agency action" by the BLM to sell those units of timber that are scattered throughout the 2.4 million acres of BLM lands in western Oregon. The BLM contends that there are instead seven separate Timber Management Plans and an individual administrative decision relating to each of these timber sales supported by separate NEPA documentation and administrative records.

Without a specifically identified final agency action or actions, the BLM contends that it is impossible for the court to conduct judicial review because the record cannot be identified until the final agency action is specified.

Plaintiffs argue that the *Lujan* case has nothing to do with the facts in this case. Plaintiffs assert that the BLM has a concrete statewide program for selling timber, and its refusal to prepare an Environmental Impact Statement examining the impacts of that statewide program threaten specific injury to the protected interests of plaintiffs. Plaintiffs explain that the effects of the refusal of the BLM to prepare an Environmental Impact Statement in this case are not limited to the particular parcels of land as the challenged decisions were in *Lujan*, but rather extend to all areas where there are or may be northern spotted owls.

In *Lujan*, environmental organizations sought and obtained an injunction, suspending the BLM's "land withdrawal review program," a program in which the BLM was deciding whether hundreds of individual withdrawals of public lands from appropriation under the mining laws should be continued or terminated. In their complaint, the environmental organizations alleged in general:

that the reclassification of some withdrawn lands and the return of others to the public domain would open the lands up to mining activities, thereby destroying their natural beauty. Respondent alleged that petitioners, in the course of

administering the Nation's public lands, had violated the FLPMA by failing to "develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands," 43 U.S.C. § 1712(a) (1982 ed.); failing to submit recommendations as to withdrawals in the 11 western States to the President, § 1714(1); failing to consider multiple uses for the disputed lands, § 1732(a), focusing inordinately on such uses as mineral exploitation and development; and failing to provide public notice of decisions, §§ 1701(a)(5), 1712(c)(9), 1712(f), and 1739(e). Respondent also claimed that petitioners had violated NEPA, which requires federal agencies to "include in every recommendation or report on ... major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on ... the environmental impact of the proposed action." 42 U.S.C. § 4332(2)(C). Finally, respondent alleged that all of the above actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and should therefore be set aside pursuant to § 10(e) of the APA, 5 U.S.C. § 706.

*Lujan*, 110 S.Ct. at 3183–84.

The district court granted summary judgment in favor of the BLM on the grounds that the environmental organizations had no standing to seek judicial review of the BLM's actions under the APA. The district court concluded that the affidavits of two of the members of the National Wildlife Federation alleging injury were not sufficient to challenge "each of the 1250 or so individual classification terminations and withdrawal revocations" which were affected under the land withdrawal program. *National Wildlife Fed'n v. Burford*, 699 F.Supp. 327, 332 (D.D.C.1988).

The Court of Appeals reversed the judgment entered by the trial court for the BLM, finding that the affidavits of two of the members of the National Wildlife Federation were sufficient in themselves, and further finding that the district court had abused its discretion by not considering

four additional affidavits offered by the environmental organizations. The Court of Appeals also concluded that standing to challenge individual decisions as to land classification and withdrawal conferred standing to challenge all such decisions under the land withdrawal review program. *National Wildlife Fed'n v. Burford,* 878 F.2d 422 (D.C.Cir.1989).

The Supreme Court granted review and addressed the sufficiency of the affidavits offered by the environmental organizations to establish that they had standing to challenge the land withdrawal program and to obtain the relief sought. The Supreme Court reversed the judgment of the Court of Appeals and found that the environmental organizations had failed to identify any particular agency action that was the source of the alleged injury to the recreational use and aesthetic enjoyment of certain members of the environmental organizations. In reaching this conclusion, the Supreme Court offered the following explanation, which is relied upon by the BLM in this case to support its position that this court cannot review the action before it:

> It is impossible that [petitioners'] affidavits would suffice, as the Court of Appeals held, to enable respondent to challenge the entirety of petitioners' so-called "land withdrawal review program." That is not an "agency action" within the meaning of § 702, much less a "final agency action" within the meaning of § 704. The term "land withdrawal review program" (which as far as we know is not derived from any authoritative text) does not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations. It is simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required by the FLPMA. It is no more an identifiable "agency action"—much less a "final agency action"—than a "weapons procurement program" of the Department of Defense or a "drug interdiction program" of the Drug Enforcement Administration. As the District Court explained, the "land withdrawal review program" extends to, currently at least, "1250 or so individual classification terminations and withdrawal revocations." 699 F.Supp., at 332.

> Respondent alleges that violation of the law is rampant within this program—failure to revise land use plans in proper fashion, failure to submit certain recommendations to Congress, failure to consider multiple use, inordinate focus upon mineral exploitation, failure to provide required public notice, failure to provide adequate environmental impact statements. Perhaps so. But respondent cannot seek *wholesale* improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made. Under the terms of the APA, respondent must direct its attack against some particular "agency action" that causes it harm.

*Lujan,* 110 S.Ct. at 3189–90 (emphasis in original and footnote omitted).

Section 10(a) of the APA provides judicial review for "[a] person suffering legal wrong because of agency action, or adversely affected *or* aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Under the provisions for general review of the APA, the "agency action" in question must be "final agency action." 5 U.S.C. § 704. The final action of an agency for which there is no other adequate remedy is subject to judicial review.

In this case, plaintiffs allege in their amended complaint:

> On April 10, 1987, the Oregon State Director of the BLM decided to continue logging suitable spotted owl habitat as proposed in the original TMPs. The Director decided not to supplement the existing EISs because he deemed the new information regarding the effects of such logging on the spotted owl "not significant." ... As a result of the Director's decision, owl habitat on BLM lands in

western Oregon continued to be logged—and will continue to be logged—at a rate that could foreclose defendant's ability to provide meaningful protection for the northern spotted owl and other old-growth dependent species. New resource management plans originally scheduled for 1990, but now not expected before late 1992 at the earliest, will be too late to stop the irreversible effects of current owl habitat destruction.

Amended Complaint, pp. 11–12, para. 15.

The NEPA claim of plaintiffs focuses upon the decision of the Oregon State Director of the BLM not to prepare a Supplemental Environmental Impact Statement addressing the effects of further logging in spotted owl habitat upon the survival of the northern spotted owl subspecies. The decision of the BLM not to prepare Supplemental Environmental Impact Statements was made on April 10, 1987 and was a final action of the BLM subject to judicial review. Since the time this lawsuit was filed, the BLM has been able to identify the act complained about—that is, the decision of the BLM not to prepare a Supplemental Environmental Impact Statement—and has been able to address the alleged deficiency with a discrete and well-defined agency action.

This court has heretofore reviewed the decision of the BLM of April 10, 1987 not to prepare a Supplemental Environmental Impact Statement and has ruled that that decision was an arbitrary and capricious decision. The BLM has known since May 18, 1989 that, in this court's opinion, the existing Environmental Impact Statements were not adequate, and the issue of the effects of the 1979 to 1983 Timber Management Plans on the long-range survival of the northern spotted owl subspecies should be addressed by the BLM under NEPA. The BLM has had the opportunity to address the information relating to the effects of planned logging on the survival of the northern spotted owl subspecies; to allow the public to participate as contemplated by Congress; and thereafter to formulate a plan giving consideration to the comments of the scientific community and the public.

There is no basis for the BLM to argue that no final action of the BLM has been taken so as to be challenged by plaintiffs or to argue that plaintiffs have not demonstrated standing to allow the court to review the final action of the BLM.

### 3) *The O & C Act*

■ The BLM argues that the provisions of the O & C Act restrict the power of this court to enforce the requirements of NEPA. The BLM asserts that the O & C Act commands the BLM to sell no less than 500 million board feet of timber annually. To the extent that NEPA would prevent the BLM from offering 500 million board feet of timber annually, the BLM asserts that NEPA cannot be enforced and the O & C Act must be complied with.

Plaintiffs argue that the O & C Act provides the BLM with discretion to set an annual sustained yield on O & C lands of less than 500 million board feet of timber and to account for obligations imposed by other environmental laws in setting these amounts. Plaintiffs argue that the position taken by the BLM is contrary to the regulations interpreting the O & C Act in the Code of Federal Regulations and inconsistent with the BLM's recognition that the Endangered Species Act may prevent the sale of more than 500 million board feet of timber annually.

In *Headwaters, Inc. v. BLM, Medford Dist.*, 914 F.2d 1174 (9th Cir.1990), the court explained:

The purposes of the O & C Act were twofold. First, the O & C Act was intended to provide the counties in which O & C Act land was located with the stream of revenue which had been promised but not delivered by the Chamberlain–Ferris Revestment Act.... The counties had failed to derive appreciable revenue from the Chamberlain–Ferris Act primarily because the lands in question were not managed so as to provide a significant revenue stream; the O & C Act sought to change this. Second, the O & C Act intended to halt previous practices of clear-cutting without refor-

estation, which was leading to a depletion of forest resources.

*Id.* at 1183 (citations omitted). The O & C Act is not legislation designed to protect the environment. The court in *Headwaters* explained that "[n]owhere does the legislative history suggest that wildlife habitat conservation or conservation of old growth forest is a goal on a par with timber production, or indeed that it is a goal of the O & C Act at all." *Id.* at 1184.

The O & C Act requires, in part, that:

The annual productive capacity for such lands shall be determined and declared as promptly as possible after August 28, 1937, but until such determination and declaration are made the average annual cut therefrom shall not exceed one-half billion feet board measure: *Provided,* That timber from said lands in an amount not less than one-half billion feet board measure, or not less than the annual sustained yield capacity when the same has been determined and declared, shall be sold annually, or so much thereof as can be sold at reasonable prices on a normal market.

43 U.S.C. § 1181a (emphasis in original).

This language does not mandate that the BLM offer for annual sale a minimum of 500 million board feet of timber. The plans for the sale of timber from the O & C lands and from public lands are developed annually and may subsequently be changed, altered or amended by the authorized officer. 43 C.F.R. § 5410.0–6. The regulations promulgated by the BLM to implement the O & C Act authorize the BLM to "preserve, protect, and enhance areas of scenic splendor, natural wonder, scientific interest, primitive environment, and other natural values for the enjoyment and use of present and future generations." 43 C.F.R. § 6220.0–1.

The plain language of 42 U.S.C. § 1181a is that the BLM shall determine and declare the annual productive capacity for the O & C lands and shall sell an amount not less than "one-half billion feet board measure, *or* not less than the annual sustained yield capacity when the same has been determined and declared." 43 U.S.C.

§ 1181a (emphasis added). In making this determination and declaration, the BLM must comply with all applicable laws, including NEPA.

No language in 42 U.S.C. § 1181a empowers this court to exempt O & C lands from the requirements of NEPA so as to permit the BLM to avoid the preparation of an Environmental Impact Statement. The BLM concedes that the provisions of the Endangered Species Act must be enforced despite any adverse effects upon the amount of timber available on O & C lands, but argues that the enforcement of NEPA should be treated differently. The BLM relies upon the statutory language of Section 102 of NEPA, 42 U.S.C. § 4332, which requires compliance with the directives therein "to the fullest extent possible" in asserting that this court should not require the BLM to comply with NEPA in this case given the purpose of the O & C Act. The BLM asserts that it need not comply with the requirements of NEPA when to do so would preclude the BLM from carrying out the statutory purpose of the O & C Act to sell timber. While the BLM acknowledges that the preparation of NEPA documents does not conflict with the O & C Act, the BLM asserts that the injunctive relief allowed under NEPA conflicts with the O & C Act and cannot be granted by this court.

The requirements of NEPA have given way to other statutory provisions under certain circumstances. In *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.,* 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976), the Secretary of Housing and Urban Development had a duty under the Interstate Land Sales Full Disclosure Act (Disclosure Act), 15 U.S.C. §§ 1701–1720, to allow a statement of record filed by a real estate developer to become effective (absent inaccurate or incomplete disclosure) within thirty days after it was filed. If the Secretary were required under NEPA to prepare an Environmental Impact Statement before allowing the filed statement to become effective, the Supreme Court recognized that it would not be possible to satisfy the thirty-day period of the Disclosure Act. The Supreme Court found a

"clear and fundamental conflict of statutory duty" between the Disclosure Act and NEPA. *Id.* at 791, 96 S.Ct. at 2439. The Supreme Court determined that NEPA itself provides that "where a clear and unavoidable conflict in statutory authority exists, NEPA must give way." *Id.* at 788, 96 S.Ct. at 2438.

In *Jones v. Gordon,* 792 F.2d 821 (9th Cir.1986), defendant Sea World, Inc. urged the court to find that Section 104(d) of the Marine Mammal Protection Act of 1972, 16 U.S.C. §§ 1361–1407, which sets forth certain time limitations for processing permit applications, exempts the National Marine Fisheries Service from preparing an Environmental Impact Statement otherwise required under NEPA because the time period provided in the two statutes could not be reconciled. Sea World relied upon the same language that the BLM relies upon in this case. The Court of Appeals examined the *Flint Ridge* case closely and concluded that the statutes can be reconciled:

The issue is not without doubt and Sea World's argument is plausible. Nevertheless, we agree with the district court that the apparent conflict between section 104(d) and NEPA is reconcilable.

We begin our analysis with the important congressional mandate to have NEPA apply "to the fullest extent possible." 42 U.S.C. § 4332. These are strong words directing our statutory interpretation. The language was added by the Senate and House conferees who stated in explanation:

The purpose of the new language is to make it clear that each agency of the Federal Government shall comply with the directives set out in ... [Section 102(2) ] unless the existing law applicable to such agency's operations expressly prohibits or makes full compliance with one of the directives impossible.... Thus, it is the intent of the conferees that the provision "to the fullest extent possible" shall not be used by any Federal agency as a means of avoiding compliance with the directives set out in section 102.... [N]o agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance.

115 Cong.Rec. 39703 (1969), *quoted in Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission,* 449 F.2d 1109, 1114–15 (D.C.Cir.1971). Thus, it appears to be the congressional desire that we make as liberal an interpretation as we can to accommodate the application of NEPA.

*Jones,* 792 F.2d at 825–26.

There is not an irreconcilable conflict in the attempt of the BLM to comply with both NEPA and the O & C Act. The BLM concedes that the preparation of NEPA documents does not conflict with the O & C Act but asks the court to conclude that its failure to comply with NEPA should be excused where the failure to comply causes a reduction in the timber available for harvest on O & C lands. Such a conclusion, however, would allow the BLM to continue to act insulated from public comment because of its own delay in examining the environmental consequences of its actions.

The BLM is required to comply to the best of its ability with both NEPA and the O & C Act. The perceived harm suffered by the beneficiaries of the O & C Act must be addressed by the BLM.

In conclusion, the continued sale of timber in the habitat of the northern spotted owl subspecies under the 1979 to 1983 Timber Management Plans without a Supplemental Environmental Impact Statement which examines the impact of these sales on the survival of the northern spotted owl subspecies violates NEPA. There are no defenses to excuse the BLM from complying with NEPA. Plaintiffs' motion for summary judgment on the NEPA claim is granted. The BLM shall submit to this court within thirty days of the date of this opinion and order a timetable for the completion of a Supplemental Environmental Impact Statement or its functional equivalent. Plaintiffs and intervenors shall provide to the court their comments as to the proposed timetable within fifteen days thereafter. The court will issue an order

requiring the BLM to complete the steps to meet the schedule ordered.

## Relief Requested

Plaintiffs ask the court to grant a permanent injunction against further logging in suitable northern spotted owl habitat pending compliance by the BLM with the terms and conditions of NEPA. The BLM argues that the equities of the case counsel against the general injunction sought by plaintiffs.

 When actual success on the merits is shown, the inquiry is over and the party is entitled to relief as a matter of law irrespective of the amount of irreparable injury shown. *Sierra Club v. Penfold,* 857 F.2d 1307, 1318 (9th Cir.1988). The protection requested by plaintiffs for habitat suitable for the northern spotted owl subspecies is directly related to the rights of the public to participate in an agency plan addressing the survivability of the northern spotted owl subspecies prior to the further destruction of the habitat of the northern spotted owl.

 However, "an injunction does not issue automatically on a showing that an environmental impact statement is defective." *Northern Cheyenne Tribe v. Hodel,* 851 F.2d 1152, 1158 (9th Cir.1988), *quoting Amoco v. Village of Gambell,* 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). In deciding whether to issue an injunction in which the public interest is affected, a district court must expressly consider the public interest on the record. In *Northern Cheyenne,* the Indian Tribe sought to enjoin the Secretary of the Interior from proceeding with federal coal leases without complying with federal law. The district court granted summary judgment for the Tribe and issued an injunction suspending the leases as being in violation of NEPA, the Federal Coal Leasing Amendments Act, and the responsibilities of the United States as trustee of the Tribe. The district court ordered that the suspension of the leases was to last until the Secretary prepared a Supplemental Environmental Impact Statement addressing the cultural, social and economic impacts of issuing the coal leases.

The Court of Appeals reversed and remanded the judgment of the district court, concluding:

[A]s to the more general National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*[,] its high aim "to create and maintain conditions under which man and nature can exist in productive harmony," 42 U.S.C. § 4331, does not show a congressional intent to foreclose equitable balancing by a court enforcing its requirements.

The district court, however, engaged in its balancing of the equities on an inadequate record and to that extent abused its discretion. We cannot tell from that record what the costs would be to the Tribe, the public, and Western Energy from any particular resolution of the issue. The district court should now promptly hold an evidentiary hearing to determine these costs and then decide whether or not an injunction is appropriate. If the district court should determine that the threatened harm to the environment, including the cultural, social and economic cost to the Tribe, would be irreparable and that the balance of equities favors the Tribe, all mining shall be stayed until the Secretary completes his new review.

*Northern Cheyenne,* 851 F.2d at 1158.

The BLM asks this court to examine the effects of each of the timber sales found not to create jeopardy to the northern spotted owl subspecies under the Endangered Species Act and otherwise cleared for sale and to vacate the preliminary injunction as to these timber sales. The BLM asserts that it has performed a biological assessment as to each of its 1992 timber sales and has then submitted "nearly all of its FY 1992 timber sales to Fish and Wildlife Service for that agency's independent evaluation of impacts to the spotted owl. Fish and Wildlife Service has issued a biological opinion (Def's Exh. 206), dated February 4, 1992, finding that 82 of BLM's FY 1992 timber sales will not put the spotted owl in jeopardy." Reply on Defendant's Motion to Vacate Preliminary Injunction, p. 7. The BLM asserts that 78 of these 82 timber

sales found to create no jeopardy to the northern spotted owl subspecies should go forward.

This court cannot evaluate the risks that particular timber sales pose to the survival of the northern spotted owl subspecies using the existing Timber Management Plans which do not address the issue of the long-range survival of the northern spotted owl subspecies or contain any plan for long-range management of the northern spotted owl subspecies on BLM lands. In *Lane County Audubon Soc'y v. Jamison,* 958 F.2d at 294, the court noted that "[t]he impact of each individual sale on owl habitat cannot be measured without reference to the management criteria established in the [Timber Management Plans] and the Jamison Strategy." The existing Timber Management Plans do not adequately address the impact of the individual planned timber sales on the survival of the northern spotted owl subspecies.

The BLM admits that "responsible experts in population ecology and related disciplines believe that new information shows that the SOHA strategy [used in the existing Timber Management Plans] is inadequate to preserve the northern spotted owl subspecies." BLM's Opposition to Plaintiffs' Statement of Material Facts Not in Dispute, p. 6. This court cannot do what the process of preparing the Timber Management Plans and an Environmental Impact Statement is intended to accomplish. This court cannot evaluate the risks that particular timber sales pose to the survival of the northern spotted owl subspecies when the BLM has no plan that addresses the survival of the northern spotted owl subspecies.

The BLM asks this court to accept that its consultation with the United States Fish and Wildlife Service under the Endangered Species Act constitutes a substitute for compliance with NEPA. The purpose of the Endangered Species Act and the purpose of NEPA are not the same. For example, there is no substitute in the Endangered Species Act for the public comment commanded by NEPA. In *Seattle Audubon Soc'y v. Evans,* 952 F.2d 297,

301–02 (9th Cir.1991), the court addressed the issue of whether the United States Forest Service was required to comply with the provisions of the National Forest Management Act that apply to the northern spotted owl subspecies while at the same time complying with the provisions of the Endangered Species Act. The court ruled that the United States Forest Service must abide by both laws and explained: "As the district court said in its March 7 order: '[A]n agency cannot exempt itself from duties plainly imposed by law; it cannot decide that only one of two statutes governs its activities when the laws themselves, and the implementing regulations, clearly show that both apply.'" *Id.* at 302.

The purpose of requiring a Supplemental Environmental Impact Statement is to "ensure[] that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh v. Oregon Natural Resources Council,* 109 S.Ct. at 1858. Going forward with timber sales without the preparation of a Supplemental Environmental Impact Statement or its equivalent is directly contrary to that purpose.

This court must grant the proposed injunctive relief if it determines that "the threatened harm to the environment ... would be irreparable and that the balance of equities favors" the plaintiffs. *Northern Cheyenne Tribe v. Hodel,* 851 F.2d at 1158. The threatened harm to the environment is irreparable. This court has ruled that:

The destruction of owl habitat without compliance with law is a significant and irreparable injury. Old growth forests are lost for generations, and no amount of monetary compensation can replace the environmental loss. Courts in this circuit have recognized that timber cutting causes irreparable damage and have enjoined cutting when it occurs without proper observance of NEPA procedures or other environmental laws.

Opinion, March 29, 1989, pp. 3–4.

There is no defense for the BLM's failure to comply with NEPA, and there will be no opportunity for the BLM to comply with

NEPA after the agency's proposed actions are taken.

In *Seattle Audubon Soc'y v. Evans*, 771 F.Supp. 1081 (W.D.Wash., *aff'd*, 952 F.2d 297 (9th Cir.1991)), the district court ordered the United States Forest Service to prepare revised standards and guidelines to ensure the viability of the northern spotted owl subspecies, together with an Environmental Impact Statement, and enjoined logging in suitable owl habitat until such standards and guidelines were adopted. The court explained:

> To bypass the environmental laws, either briefly or permanently, would not fend off the changes transforming the timber industry. The argument that the mightiest economy on earth cannot afford to preserve old growth forests for a short time while it reaches an overdue decision on how to manage them, is not convincing today. It would be even less so a year or a century from now.

*Id.* at 1096.

The Court of Appeals affirmed the injunctive relief granted in the *Seattle Audubon* case. The record in this case convinces this court that the balance of the equities before the court is no less compelling.

On December 21, 1987, Congress explicitly directed that "[t]he ... Bureau of Land Management [is] to continue to complete as expeditiously as possible development of ... Resource Management Plans to meet all applicable statutory requirements." Section 314 of the Department of the Interior and Related Agencies Appropriations Act, Pub.L. No. 100–202, 101 Stat. 1329 (1987). Congress allowed the BLM to continue its operations without court scrutiny while this legislation was in effect. Four years and five months have passed, and Congress has withdrawn its protection. The BLM must now complete its statutory duties.

## CONCLUSION

Plaintiffs' renewed motion for summary judgment (# 739) is granted. Defendant's motion to vacate preliminary injunction (# 755) is denied. The BLM shall submit to this court within thirty days of the date of this opinion a timetable for the completion of a Supplemental Environmental Impact Statement or its functional equivalent. Plaintiffs and intervenors shall provide to the court their comments as to the proposed timetable within fifteen days thereafter. The court will thereafter promulgate a timetable for the completion of a Supplemental Environmental Impact Statement or its functional equivalent and issue an order to the BLM to comply with the terms of the timetable.

On the basis of the foregoing opinion, it is hereby ordered that:

1. Federal defendants (collectively, the BLM) are hereby enjoined from offering or awarding, or allowing any logging operations or land-altering activities to occur in connection with, any timber sale not awarded prior to 1992 that:

A. would log suitable habitat for the northern spotted owl, defined by the U.S. Fish & Wildlife Service (FWS) as follows:

> Suitable owl habitat has moderate to high canopy closure (60 to 80 percent); multi-layered, multi-species canopy dominated by large (> 30 inches in diameter at breast height (dbh)) overstory trees; a high incidence of large trees with various deformities (e.g., large cavities, broken tops, dwarf-mistletoe infections, and other evidence of decadence); numerous large snags; large accumulations of fallen trees and other woody debris on the ground; and sufficient open spaces below the canopy for owls to fly.

55 Fed.Reg. 26114, 26116 (1990); or

B. "may affect" the northern spotted owl, as determined by the BLM pursuant to 16 U.S.C. § 1536(a)(2) and implementing regulations thereunder.

2. This injunction shall remain in effect until the BLM submits to this court a Supplemental Environmental Impact Statement or its functional equivalent which examines new information on the effects of logging on the northern spotted owl subspecies as

required by NEPA or until a higher court vacates this injunction.